## GARLOCK *v.* MOTZ TIRE & RUBBER CO.

1. PRINCIPAL AND AGENT—ACCEPTANCE OF OFFER—EVIDENCE.

   As evidence of the fact of acceptance by an agent of a proposal made by his principal, the acts done in performance may be shown, where they were known to such principal.

2. CONTRACTS—MUTUALITY—IMPLICATION—CONSTRUCTION.

   Though mutuality is an essential requirement of a contract, a promise to do what is proposed will be implied from acceptance. A contract that leaves one party free to terminate it at will must be construed as authorizing the other party to terminate it also at his option.[1]

3. SAME—TERMINATION—PERFORMANCE.

   Under an agreement which leaves the agent free to terminate it at will, the principal is authorized to terminate it at will.

4. SAME—PROVISIONS FOR TERMINATION.

   Where a contract for the exclusive agency of a given make of tires required the agent to exercise diligence to keep a stock of tires on hand, and gave the principal company the right to terminate the contract if it should at any time become dissatisfied with results obtained or manner in which he handled the business, not fixing any period for the duration of the agency, the tire company could put an end to the agency at will.

[1]Authorities passing on the question of mutuality of contract which by its terms is binding upon only one of the parties for the time designated, see note in 20 L. R. A. (N. S.) 899.

5. SAME—DAMAGES—EXPENSES.

> Upon termination by the tire company of the agency, plaintiff could not recover for his expenses in carrying out its conditions or other losses than that of getting rid of his stock, for which defendant had received payment.

Error to Wayne; Hosmer, J.   Submitted April 20, 1916.   (Docket No. 47.)   Decided September 26, 1916.

Assumpsit by Edward A. Garlock against the Motz Tire & Rubber Company for damages for breach of a contract of agency.   Judgment for defendant on a verdict directed by the court.   Plaintiff brings error. Reversed.

*Lucking, Helfman, Lucking & Hanlon,* for appellant.
*Clark, Lockwood, Bryant & Klein (Carl B. Grawn,* of counsel), for appellee.

Plaintiff, as the Imperial Motor Company, operated a garage in the city of Washington, D. C., and was selling agent there for White cars and Rauch Lang electric cars. He acquired the garage in the spring of 1910. Defendant is a manufacturer of tires, said to be especially adapted for use on automobile trucks and electric pleasure cars. In December, 1911, there were few pleasure cars, and no trucks, equipped with Motz tires in use in Washington. Plaintiff tried a set of the tires upon a particular car, became acquainted with defendant, and accepted a selling agency of the tires, in the execution of which he developed a considerable local use and demand for them. A second agreement was made, the terms of which are embodied in a letter dated November 13, 1912, which reads:

"AKRON, OHIO, November 13, 1912.
"IMPERIAL MOTOR COMPANY,
    "Washington, D. C.
"*Gentlemen:*
    "Attention Mr. E. A. Garlock:
    "Confirming conversation with your Mr. Garlock yes-

terday, we have agreed to allow you to work in the State of Maryland, as well as the District of Columbia, and will protect you on any tires shipped into that territory, sold direct by us or sold by you. It is understood and agreed we are to allot you this territory as long as you remain active and produce results, with the understanding that we are at liberty to abrogate this agreement if at any time we become dissatisfied with the results being obtained, or with the manner in which the business is handled. It is understood and agreed that we will notify you in writing to this effect. You agree to issue guaranty blank with each and every tire, or set of tires, delivered by you. At all times it is understood that you will endeavor to get the customers to sign the guaranty blank. In the event you are unable to secure his signature, you will favor us with an unsigned guaranty blank. You are also to be governed by the rated carrying capacity of the tire as to the sized tire applied. In other words, you agree to see that tires are applied amply large to take care of the load to which they may be subjected. It is also understood and agreed that you will place a salesman in Baltimore and, as business demands, will open up a salesroom. You are also supposed to have a salesman traveling in Maryland and assist dealers in the sale of Motz tires. We agree to favor you with our co-operation at all times and will refer inquiries that we may receive whenever advisable. In the event we deem it advisable to carry on the sale of tires direct, we will so do, but you will receive your commission in the transaction. It is also understood and agreed that you will carry a stock of tires and will take care of the payment on the 10th of the month, following the date of invoice. Agreeing to the above, we will allow you a 15% trade discount from the manufacturer's list, with a 5% for cash. You are at liberty to sell the tires on our exchange basis. It is also understood and agreed that you will maintain prices and sell according to our published list. Regarding advertising, this matter was not thoroughly decided upon but we agreed to write the Washington Herald and secure rates and in the event we find it advisable to advertise in the Washington Herald and you are able

to secure a better advertising rate than ourselves, we will be very glad to allow you to place the advertising and favor us with a credit memorandum for the amount of the advertising.  We also agreed to mention in all advertisements run on Motz tires that you are agent for the Motz tire, and the factory is the Motz Tire & Rubber Company, Akron, Ohio.  We believe this will add prestige to the advertising and will produce better results.  Now, Mr. Garlock, we believe we have covered the proposition fully and if you can think of anything that has not been covered, we would be very glad to receive a letter on the subject.  We would also appreciate a few lines advising whether the above meets with your approval.

"Very truly yours,
"The Motz Tire & Rubber Company,
"P. M. Pontius, Sales Manager."

Business was continued under this agreement until, after some negotiations concerning a new agreement, defendant undertook, in February, 1913, to terminate the relations, itself establishing a branch house or direct selling system in Washington.  In his declaration plaintiff alleges performance on his part of the first contract—of December 22, 1911—and that in February, 1913, defendant refused to further sell its tires to him or to continue him as its exclusive agent in the territory; that he was ready and willing to perform the contract, and sustained injury and was damaged by defendant's action.  In the second count plaintiff alleges the making of the agreement of December 22, 1911, and the one of November 13, 1912, averring that upon receipt of the letter of November 13, 1912—

"he immediately accepted defendant's said offer to represent it in said State of Maryland in the sale of its said product and commenced performance of said agreement and actively engaged in promoting sales of and selling defendant's said tires in said State of Maryland.  *  *  *

"And plaintiff avers that the said defendant, not

regarding its promise and agreements made with plaintiff on, to wit, December 22, 1911, relative to plaintiff representing defendant in the said city of Washington and vicinity in the sale of its tires, as aforesaid, and said defendant, contriving to injure and deceive the said plaintiff, did afterwards and on, to wit, February 10, 1913, wrongfully and fraudulently pretend and insist that said agreement of November 13, 1912, giving plaintiff the said exclusive right to sell defendant's said product within the State of Maryland, had superseded and abrogated said prior agreement between plaintiff and defendant entered into as aforesaid on, to wit, December 22, 1911, giving plaintiff the exclusive right to sell defendant's said product within the city of Washington and vicinity; and said defendant did at said time, to wit, February 10, 1913, thereupon refuse to further sell any of its said tires to plaintiff at the terms of and under said agreement of December 22, 1911, but did, just as the sale of defendant's said product within said city of Washington and vicinity would become profitable to said plaintiff, to wit, on February 10, 1913, refuse to sell any more of said product to plaintiff, or to further continue plaintiff its exclusive sales agent within said territory, namely, city of Washington and vicinity, although often requested by plaintiff so to do; and the said defendant also, intending to injure and deceive said plaintiff, did not, nor would, give him the exclusive sale of said tires within said city of Washington and vicinity, but, on the contrary, after, to wit, February 10, 1913, said defendant did install within said city of Washington a branch house for the sale of its product under its direct supervision and control, and did thereafter, and has up to the present time, been able to sell, by reason of the demand for said tires created by plaintiff, as aforesaid, and has actually sold, large quantities of its said tires within said city of Washington and vicinity, in violation of its said agreement of December 22, 1911, with plaintiff.

"And plaintiff further alleges that he was, on said February 10, 1913, and at all times thereafter, ready and willing to perform and execute all things on his part to be performed under said last-mentioned agree-

ment and contract, but that said defendant has ever since neglected and refused to sell plaintiff its said product, or to make plaintiff its exclusive agent within said last-named territory, or to permit plaintiff to carry out and perform his part of said agreement"

—and that he suffered injury and was damaged by defendant's action in loss of profits, loss of the value of his services from December 22, 1911, to February 10, 1913, and large sums of money expended by him in creating a demand for the tries. The third count does not materially differ from the second. The declaration concludes with the common counts in assumpsit. Plaintiff's bill of particulars is:

To moneys expended and liabilities incurred by plaintiff, between, to wit, December 1, 1911, and February 15, 1913, in creating a demand for and in selling defendant's product, to wit, Motz tires, in Washington and vicinity, to wit:

| | |
|---|---:|
| Advertising ............................... | $6,807 52 |
| Salesmen and solicitors ..................... | 3,802 47 |
| Freight and express on Motz tires and misc. expenses ................................ | 1,186 28 |
| Shop labor .............................. | 1,319 63 |
| Shop supplies ........................... | 21 24 |
| General expenses ......................... | 2,118 67 |
| Office expense ........................... | 864 50 |
| Insurance ............................... | 69 98 |
| Interest ................................. | 1,848 00 |
| Personal services (plaintiff) to wit.......... | 5,000 00 |
| To loss of profits on sales of defendant's product in Washington and vicinity from, to wit, February 15, 1913, to date, to wit.......... | 10,000 00 |
| To loss of profits on future sales of defendant's product in said territory, to wit, upwards of | 25,000 00 |
| To interest thereon, to wit.................. | 5,000 00 |

Plaintiff offered testimony tending to prove that he performed properly his duties as agent, and made considerable outlays of money to increase the sales of defendant's tires in the territory; that the action of defendant left him with a considerable stock of tires on

hand, which were sold at a loss, and a lease of premises, which he was unable to re-rent. He offered also testimony tending to prove that defendant canceled the agency contract, not because plaintiff failed in any particular to perform the contract and to advance sales, but for the reason that he built up a business so remunerative that defendant wished to save commissions —or what was equivalent thereto in discounts—and for mere additional profits to itself established a branch house. Plaintiff contended that he was entitled to damages:

*First,* for the loss of profits on repeat orders.

*Second,* for the actual moneys expended in promoting and working up a market in his territory for defendant's product.

No testimony was introduced by defendant, who moved, when plaintiff rested, for a peremptory instruction in its favor, which motion was granted. Referring to the two contracts, the court said to the jury:

"It seems to me, gentlemen of the jury, that this contract has inherently the same vice that belongs to the other contract; that the mere fact that it may be said that he agreed to do these things, for there is an agreement implied by the acceptance of the contract, it is not such an agreement as would render it definite, or would furnish a consideration for a like employment or an employment during which he might be protected, but if I am wrong in that position, the language which is used here—'It is understood and agreed we are to allot you this territory as long as you remain active and produce results, with the understanding that we are at liberty to abrogate this agreement if at any time the company is dissatisfied with the results being obtained, or with the manner in which the business is handled'—whatever may be said upon the good faith as illustrated in other contracts, which have been considered by the Supreme Court of this State, it seems to me beyond controversy that the language which is employed there means that when it became more profitable for the defendants in that case to sell

direct than selling through an agency, they were at liberty, under the express clause of the contract, to abrogate the contract and open their branch. Now, under these circumstances, gentlemen of the jury, I feel constrained to remove this case from your consideration. Even if I were to leave it to the jury upon the last contract under the evidence which has been admitted in this case, the other contracts having been closed up, I think—if this supersedes it, it would be difficult for me to lay down to the jury at the present time what damages would arise upon it, and for these reasons I feel, gentlemen, that you are compelled to render a verdict in favor of the defendant."

Whether the instruction was right is the question presented.

OSTRANDER, J. (*after stating the facts*). It is unnecessary to cite authority to support the proposition that promises may be a good consideration for promises, and that a contract evidenced by mutual promises may be valid. And acceptance by the agent of a proposal made by the principal may be shown by performance by the agent to the knowledge of the principal of the things which the proposal exacts. A promise to do what it is proposed shall be done may be implied from acceptance of the proposal. *Mueller* v. *Spring Co.*, 88 Mich. 390 (50 N. W. 319) ; *Emerson* v. *Packing Co.*, 96 Minn. 1 (104 N. W. 573, 1 L. R. A. [N. S.] 445, 113 Am. St. Rep. 603, 6 Am. & Eng. Ann. Cas. 973) ; *Kaufman Bros. & Co.* v. *Manufacturing Co.*, 78 Iowa, 679 (43 N. W. 612, 16 Am. St. Rep. 462). But mutuality is essential. 1 Page on Contracts, p. 452; 1 Parsons on Contracts (9th Ed.), p. 486, note.

A contract of agency which leaves the agent free to terminate relations with his principal at will ought to be construed so as to leave the principal free to discharge the agent at will, even though the agent has entered upon performance of the contract. And the general rule is that the principal may do this without

resulting liability to the agent. *Fuchs* v. *Thermometer Co.*, 178 Mich. 37 (144 N. W. 484).

"The principal has a right to determine or revoke the authority given to his agent at his own mere pleasure; for, since the authority is conferred by his mere will, and is to be executed for his own benefit and his own purposes, the agent cannot insist upon acting when the principal has withdrawn his confidence and no longer desires his aid." Story on Agency (9th Ed.), §§ 462, 463.

The mere fact that a contract, even a contract of agency, does not provide for a definite period of duration is not always controlling if some period of duration is necessarily implied, and especially if an independent consideration, other than a promise, moves to the promiser, or it is terminable upon expressed conditions.

In *Newhall* v. *Printing Co.*, 105 Minn. 44 (117 N. W. 228, 20 L. R. A. [N. S.] 899), one of a line of cases relied upon by plaintiff, the headnotes do not intimate a fact, stated in the opinion, which was that plaintiff paid $135 for the exclusive right to sell defendant's publication in a specified territory upon certain terms and conditions, the right of the defendant to terminate the contract being limited to the causes, or reasons, dishonesty, incompetence, negligence, inattention, or irresponsibility of the plaintiff. The opinion, however, recognizes the general rule and cites, among other cases, *Carnig* v. *Carr*, 167 Mass. 544 (46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488), in which case there was an independent, executed consideration moving from the employee. See, also, *Hobbs* v. *Light Co.*, 75 Mich. 550 (42 N. W. 965) ; *Stearns* v. *Railway Co.*, 112 Mich. 651 (71 N. W. 148) ; *Raymond* v. *White*, 119 Mich. 438 (78 N. W. 469) ; *Alderton* v. *Williams*, 139 Mich. 296 (102 N. W. 753). See a review of au-

thorities in *Sullivan* v. *Railway,* 135 Mich. 661 (98 N. W. 756, 64 L. R. A. 673, 106 Am. St. Rep. 403).

In *Fuchs* v. *Thermometer Co., supra,* it is stated in the opinion that plaintiff's counsel disclaimed an employment for any definite time.

In *Kaufman Bros. & Co.* v. *Manufacturing Co., supra,* it appeared that plaintiffs were wholesale dealers in cigars in the city of New York and defendant a corporation of Dubuque, Iowa, selling cigars in territory tributary to that city. Plaintiffs agreed to give to defendant the exclusive right to sell in Dubuque and country tributary thereto a certain brand of cigars, which plaintiffs had the exclusive right to manufacture. In consideration the defendant was to employ men to travel and sell the cigars and establish a trade for them in the said territory, and did so employ men, who expended time and money in building up a trade for the cigars. Plaintiffs were to ship cigars when ordered and as long as defendant desired to deal in the cigars and pushed them, or so long as trade continued. The agreement was observed for a time, and then plaintiffs refused to furnish defendant cigars for the trade, and sued for the value of a quantity already furnished. The questions determined arose upon cross-claims of defendant. The court found the contract not indefinite as to its duration, and, necessarily, that plaintiffs could not terminate it at will.

In *Willcox & Gibbs Sewing Mach. Co.* v. *Ewing,* 141 U. S. 627 (12 Sup. Ct. 94), the court considered an agreement of the parties, by the terms of which Ewing was appointed exclusive vendor of the other's sewing machines and attachments and parts in specified territory. There were various conditions, with an agreement that if at any time the connection ceased, first party would buy back such of its goods sold to second party as first party might select. Second party agreed to purchase not less than $20,000 worth, net, of ma-

chines and parts in a year, an equal amount each month. "Violation of the spirit of this agreement shall be sufficient cause for its abrogation" was one of the clauses in the contract. In discontinuing the relation Ewing was notified that the company would take off his hands the store he occupied and purchase the fixtures therein if he desired to sell and all stock Ewing had on hand obtained from it. Ewing denied the right to cancel the agreement, claiming that it was for life or the continuance of the company in business, provided he did his duty. The court, Justice Harlan writing the opinion, said this position was untenable, there being no condition to the effect that so long as he devoted his time, attention, and abilities to the company's business, he should retain his position as exclusive vendor within the territory specified, without regard to its wishes. Of the clause of the agreement above quoted, it was said that it was not equivalent to a specific provision declaring, affirmatively, that the contract should continue in force for a given number of years, or without limit as to time, unless abrogated for cause. "It was inserted by way of caution. * * *" And it is added that of course revocation by the principal of the agent's authority could not injuriously affect existing contracts made by the latter under the power originally conferred upon him. The court affirms the doctrine that if Ewing had the privilege, upon reasonable notice, of severing the connection, a like privilege could not be denied the company.

In *McKell* v. *Railway Co.*, 175 Fed. 321 (99 C. C. A. 109, 20 Am. & Eng. Ann. Cas. 1097), the contract considered was one to purchase the production of coal mines. The owner of coal lands made a contract with the railroad company, by the terms of which the landowner agreed to develop mines on the land to a stated capacity, and the company agreed to build a branch line to the mines and to purchase the coal produced at

the ruling price of a certain other coal. There was no provision for the duration of the contract. It was held that the agreement was not terminable at the will of one party, but was permanent so long as the stipulated production was maintained, unless terminated by consent of both parties. The opinion contains an interesting citation and review of authorities, including *Franklin Telegraph Co.* v. *Harrison*, 145 U. S. 459 (12 Sup. Ct. 900) ; *Western Union Telegraph Co.* v. *Pennsylvania Co.*, 129 Fed. 849 (64 C. C. A. 285, 68 L. R. A. 968) ; *Mississippi Logging Co.* v. *Robson*, 69 Fed. 773 (16 C. C. A. 400) ; *Great Northern R. Co.* v. *Railway Co.*, 5 De Gex & Sm. 138; *Llanery Railway, etc., Co.* v. *Railway Co.*, L. R. 8 Ch. App. 942 (7 H. of L. 550). The court makes this distinction:

"The case before us is to be differentiated from those which relate to contracts for personal service and special confidence, where there is an implication that the parties intended that it should not be prolonged if either of the parties should become dissatisfied."

Plaintiff, citing *Hollweg* v. *Brokerage Co.*, 197 Fed. 689 (117 C. C. A. 83), says that:

"The services rendered by plaintiff under the first contract and the working up of a market and sale of thousands of dollars of defendant's product forms a sufficient consideration for defendant's promises in the second contract, where under the second contract large quantities of tires were sold by plaintiff."

But the case cited and the one at bar are wholly dissimilar, as a reference to the opinion cited will disclose.

Stipulations in the contract before us are pointed out by plaintiff's counsel, and the argument, in part, proceeds as if they were relied upon as independent considerations for defendant's undertaking. The placing of a salesman in Baltimore and the opening up

of a salesroom, a man to travel in Maryland, and the carrying of a stock of tires to be paid for at a specified time after invoice are all referred to. These things were, however, rather incidents of the agency than separate considerations for the agreement. Unless, therefore, there is in the contract a period fixed for its duration, definite or indefinite, with reference to which provision of the contract it may be assumed that both parties made the agreement, the defendant and the plaintiff had the right to terminate it at will. The only reference to duration is:

"It is understood and agreed we are to allot you this territory as long as you remain active and produce results, with the understanding that we are at liberty to abrogate this agreement if at any time we become dissatisfied with the results being obtained, or with the manner in which the business is handled."

This provision must be read with the remainder of the contract and with reference to what was desired and sought to be accomplished. In *Carnig* v. *Carr, supra,* it was said:

"To ascertain what the parties intended by 'permanent employment,' it is necessary to consider the circumstances surrounding the making of the contract, its subject, the situation and relation of the parties, and the sense in which, taking these things into account, the words would be commonly understood."

So here the language I have quoted indicates some period of duration of the proposed contract relations; its real meaning to be determined.

Assuming, as I think we must, that the contract of November 13, 1912, was the only contract between these parties, is an agency contract, provides for some period of duration, and that its terms are controlling of the rights of the parties in so far as it has been executed, the question remains: What period of duration was agreed upon? Clearly, no definite period is

fixed. It is absurd to say that the contract was not terminable at the will of plaintiff and also say it was by agreement terminable only when he chose to become inactive and not produce results. The contract belongs to the class referred to in *Isbell* v. *Carriage Co.*, 170 Mich. 304, 313 (136 N. W. 457, 460), in this language:

"It was an agency in the nature of employment to render services involving something more than the operative fitness or mechanical utility of a tangible thing. It involved personal efficiency, energy, initiative, business experience, and ability to formulate methods and make them successful, as well as co-operation and confidential relations with defendant of such a character as to lead to the conclusion that the parties contemplated, and provided for, the right of defendant to terminate the relationship when, according to his own fancy and judgment, the work done and methods pursued were not satisfactory."

In that case the duration of the contract relation was fixed at a period of five years. Here it is fixed for a period only so long as defendant is satisfied. There is no definition of activity or estimate of results to be produced which shall be deemed satisfactory to defendant. Defendant does not engage itself to be satisfied with any manner of handling the business. The provision for cancellation—allotment of territory—is open to the construction placed upon it by the learned trial judge, namely, that the defendant was at liberty to instal a branch house and sell direct to customers when it became satisfied that was the better method of conducting its business in that territory.

It remains to be considered whether in this view of the contract relations plaintiff may recover for any disbursements made in executing the contract, or on account of any contracts he may have entered into in performing it so far as it was performed. It is to be observed in this connection that in whatever plaintiff

did in performing the contract there was an expected mutual profit. The more tires he sold, the greater was his income. There is no legal basis for computing any loss he may have sustained on account of having employed salesmen or rented a building. Suppose he had made a lease for ten years or more, and was unable to dispose of it. How much of the rental ought defendant to pay?

There is a single item of alleged loss which, in my opinion, may be held to have been contemplated by the contracting parties. The plaintiff was required to carry a stock of tires, how large a stock is not stated. Having bought them, plaintiff was at liberty to sell them again, during or after the period of the agency; if after, of course, in competition with defendant. If he had bought and was carrying, when the contract was abrogated, only a stock of reasonable size, with reference to the business he was doing, it represented a direct outlay of money, all of which defendant received, plaintiff's profit depending upon a resale. If they were disposed of reasonably at less than defendant received for them, defendant should bear the loss.

Defendant will recover costs of this court as upon an affirmance of the judgment, which, however, is reversed and a new trial granted upon the single issue suggested.

STONE, C. J., and BIRD, STEERE, and PERSON, JJ., concurred with OSTRANDER, J.

KUHN, J. I am of the opinion that no costs should be awarded to either party. Otherwise I concur.

MOORE and BROOKE, JJ., concurred with KUHN, J.