RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SCOTT L. EUNGARD,

*Plaintiff-Appellant,*

*v.*

> No. 06-2380

OPEN SOLUTIONS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 05-60272—John Corbett O'Meara, District Judge.

Argued: February 6, 2008

Decided and Filed: February 26, 2008

Before: MARTIN and SUTTON, Circuit Judges; OBERDORFER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Melinda A. Balian, FRANK, HARON, WEINER & NAVARRO, Troy, Michigan, for Appellant. Charles C. Dewitt, Jr., DeWITT, BALKE & VINCENT, Detroit, Michigan, for Appellee. **ON BRIEF:** Melinda A. Balian, Monica P. Navarro, FRANK, HARON, WEINER & NAVARRO, Troy, Michigan, for Appellant. Charles C. Dewitt, Jr., DeWITT, BALKE & VINCENT, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Scott Eungard, a salesman, seeks commissions on products and services ordered by a client on the same day he was fired. Because ambiguity in Eungard's compensation agreement precludes summary judgment for Open Solutions, we reverse and remand.

## I.

In June 2003, Open Solutions acquired Eungard's previous employer, Liberty FiTech. After the acquisition closed, Open Solutions gave Eungard the title of Area Vice President, but his job

_____

[*] The Honorable Louis F. Oberdorfer, Senior United States District Judge for the District of Columbia, sitting by designation.

description remained the same:  He sold computer software, systems and hardware to banks and credit unions in the Great Lakes region.

During Eungard's first year of employment with Open Solutions, he began pitching a sale to AurGroup Financial Credit Union.  Later that year, in March or April 2004, AurGroup collaborated with another credit union to form the Shared Resources Technology Group.  Eungard maintained responsibility for landing a contract with AurGroup and shared responsibility with Kelly Bannevans for landing a contract with Shared Resources.  Eungard performed initial groundwork on both prospects.  Yet when AurGroup sought concessions Eungard lacked authority to make, Mark Roberson (Vice President of National Sales at Open Solutions) became involved.

In June 2004, Eungard traveled to Ohio with Bannevans and Roberson to finalize the AurGroup and Shared Resources sales contracts.  By the end of the day on June 30, negotiations "had gotten pretty heated."  According to Eungard,  Roberson was placing "tremendous pressure [upon the clients] to get the contract signed on June 30th" because Open Solutions wanted to make its end-of-quarter targets.  Roberson, Eungard claims, employed "used car tactics," and the negotiations basically ended when Roberson "tossed the contract across the table . . . and told [AurGroup's CIO] to execute the agreement and . . . see what happens from there."  The meeting ended without a signed contract.  That evening, Eungard dropped Roberson off at the Dayton airport before he drove home to Detroit.  Before leaving, Roberson told Eungard to "stay engaged" with the contracts.

Eungard never had the opportunity.  As it turns out, his supervisor, George McGourty, was not pleased with Eungard, who had not completed any sales during his first year of employment and who had no promising prospects aside from AurGroup.  On the morning of July 2, less than 36 hours after Eungard left Dayton, McGourty terminated him for poor performance and allegedly promised that his commissions would be paid.

Over the same two days that McGourty planned and implemented Eungard's discharge, Roberson exchanged several emails with AurGroup's management to resolve their disputes.  The parties soon came to terms, and AurGroup and Shared Resources signed the contracts on the evening of July 2—several hours after Eungard was fired.  For reasons that remain unclear, the clients backdated their signatures to June 30.  AurGroup and Shared Resources mailed the contracts and a check to Open Solutions and faxed a copy of that preliminary check, dated July 2, on the same day.  Open Solutions received the contracts in the mail and signed them on July 6.

In the following weeks, Eungard and Open Solutions exchanged emails and voice messages regarding Eungard's request for commissions and McGourty's alleged promise that the commissions would be paid.  Open Solutions eventually paid Eungard the first half of the commission for the AurGroup contract ($11,343), initially saying it was being paid "per the comp plan," but later saying it was being paid as part of a "business decision" designed "to avoid litigation."  Eungard demanded the other half of the AurGroup commission and his share of the Shared Resources commission, but the company refused.

Eungard sued Open Solutions in Michigan state court, claiming its refusal to pay the full commissions (1) breached their contract, (2) violated the Michigan Sales Representatives Commission Act, (3) violated the procuring-cause doctrine under Michigan law and (4) breached an implied contract.  Open Solutions, a Delaware corporation whose principal place of business is in Connecticut, removed the suit to federal court based on diversity jurisdiction (Eungard is from Michigan), after which both parties moved for summary judgment.  The court ruled for the company, holding that, "[a]s of the time of Plaintiff's termination, . . . the agreements were not yet finalized or signed," that the second halves of the commissions were not "'due' to be paid to him until after

his termination" and that Eungard's statutory, procuring-cause and implied-contract claims lacked merit.

## II.

Two provisions of the company's sales commission plan govern these claims. The first establishes a schedule for commission payments:

> Commissions will be calculated on the commissionable Agreement value, then paid over the following schedule:
> - 50% in the month following Agreement signing
> - the remaining 50%, the month following conversion.

The second describes the commission payment process for employees who leave the company:

> If an Area Vice President's employment with Open Solutions is terminated, either voluntarily or involuntarily, all of the employee's closed orders as of their termination date will be reviewed for calculation of commission payments based on their status as of that date. . . . Only the amount due to be paid at termination will be paid. No additional amounts will be paid after termination.

This case raises several questions about the meaning of these two provisions: Did the orders close by Eungard's termination date? Were the first-half commission payments on those contracts, which were "schedule[d]" to be paid in the month after signing, "due to be paid at [Eungard's] termination"? Were the second-half commissions, which were "schedule[d]" to be paid following conversion, due? Did Eungard earn any of the Shared Resources commissions? And does Michigan law expand Eungard's rights to commissions beyond the contractual terms? We look at each question in turn.

## A.

*Were the orders closed?* Under the sales commission plan, Open Solutions had a duty to "review[]" only "closed orders as of [Eungard's] termination date." So if the orders were not closed as of July 2, the company had no duty. Reasoning that the orders were not fully executed when the company discharged Eungard, the district court granted summary judgment to the company.

We disagree. Under Michigan contract law, the sales contracts that the company prepared for AurGroup and Shared Resources constituted offers, which the clients accepted when they signed the contracts. *See, e.g., McKain v. Moore*, 431 N.W.2d 470, 475 (Mich. Ct. App. 1988) (holding an agreement was binding even in the absence of the offeror's signature). So far as Open Solutions was concerned, once the clients signed the contracts and mailed their checks on the evening of July 2, it had enforceable contracts. No doubt, parties may say that a contract will not go into effect until all parties have signed it, *see Palman v. Reynolds*, 16 N.W.2d 657, 658–59 (Mich. 1944), but that is not what these parties said: They said the contract would be binding "upon execution and delivery . . . by Client." Even if the clients' promises to pay did not suffice as consideration to create binding contracts, which does not appear to be the case under Michigan law, *see Garlock v. Motz Tire & Rubber Co.*, 159 N.W. 344, 346 (Mich. 1916) ("[P]romises may be a good consideration for promises . . . ."), the fact that AurGroup mailed a check to Open Solutions and faxed a copy of that check on July 2 made those orders binding as of July 2.

Nor did Open Solutions' failure to sign the agreements until July 6 prevent them from being "closed orders." The term "order" connotes action on the part of the buyer, requesting goods or services on the seller's proposed terms, *see* Webster's Third New International Dictionary 1588 (2002) (defining "order" as "a formal written authorization to deliver materials, to perform work,

or to do both"), and does not turn on the seller's formalization of an already submitted request or for that matter on whether the buyer could enforce the contract against the seller. Otherwise, the contract would give the company the immediate benefit of a binding contract without the simultaneous burden of commission payments until it chose to "close[]" the order—a reading of the contract that not only is rife with the potential for abuse but also does not respect the contract's terms.

B.

*Were the commissions due at termination?* The more difficult question is which, if any, of Eungard's claimed commission payments were "due to be paid *at* termination." (emphasis added). Relying on the "due . . . at termination" language as well as the fact that the company fired Eungard before the clients signed the contracts, the company contends it need not pay commissions that become due after the *time* of termination, even if the orders "closed" on the same *date*. While this is one plausible reading of the contract, it creates tension with the rest of the paragraph, which says that commissions will be calculated "based on their status as of that *date*." (emphasis added). Open Solutions offers no explanation why a contract would use one measure of time (days) to determine an order's status and another measure of time (hours, minutes, even seconds) to determine whether a commission is due.

Making the company's interpretation more implausible is our strong suspicion that the company paid Eungard for a full day of work on July 2 (rather than pro-rating his salary for that day) and that it did not make any termination of benefits effective until the next day. We say "suspicion" because, while the record does not confirm one way or another how or when the company ended Eungard's other employment benefits, we are not aware of any (ruthless) custom by which discharged salaried employees do not receive the benefit of a full day's pay on the day of termination, and indeed the company has not even explained at what hour (or minute) Eungard was fired, making it quite unlikely that the company pro-rated his pay for that day. Because the "due . . . at termination" clause in the final analysis plausibly allows for commission payments on accounts that close on the date of termination but happen to have been signed hours after an employee is fired, we find the provision materially ambiguous and therefore leave its meaning to be resolved by a jury. *See Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453–54 (Mich. 2003) (holding that, if a term is ambiguous, the parties' intent becomes a question of fact, which must be decided by a jury).

Both parties lean heavily upon extrinsic evidence to resolve the ambiguity. The company relies on Eungard's words: In a deposition he said that the compensation plan precludes commissions for contracts signed after the *time* of termination. Eungard relies on the company's words and actions: It paid him the first half of his AurGroup commission and said that it did so "per the comp plan." Pertinent though these words and actions may be to the parties' understanding of the contract, they do not provide a basis for granting summary judgment to one party over the other. This evidence, as an initial matter, points in opposite directions, making the resolution of the question one for the jury.

Context, moreover, weakens the value of each piece of evidence. As to Eungard's alleged admission: the company's counsel, true enough, asked Eungard if he agreed that "under the terms of the compensation plan . . . if there is no contract in place at the time that you are terminated[,] you don't earn any commission." And after his counsel objected that the question called for a legal conclusion, Eungard responded that he "would agree." The question, however, downplayed, rather than underscored, the date/time dichotomy, and Eungard's "agree[ment]" with the suggestion may simply reflect the contract's limitation on commissions to those "due . . . at termination" rather than any belief as to the meaning of "at termination." So far as the record shows, the date/time debate also had not been joined by the parties at the time of the deposition, as documents revealed only the

clients' signatures on the sales contracts (dated June 30), making Eungard's response in context an admission that any orders closed by a salesman on June 30 would require commissions to be paid to that salesman if he were fired on July 2.

Similar uncertainties cloud Eungard's reliance on the company's act of paying him the first-half commission on the AurGroup contract and its statement that it was doing so "per the comp plan." The statement might indicate that the company believed that the comp plan required it to pay the first-half commission on this contract, but it also might refer to the calculation of a given commission rather than to Eungard's right to it. And while the company says its act of paying Eungard the commission was a "business decision" designed "to avoid litigation," a jury might well discredit this claim given that a settlement request did not accompany the payment.

C.

*Were the "Conversion" Commissions Due at Termination?* Even if the first halves of the commissions might have been "due" on both contracts as of July 2, the company argues that summary judgment is still warranted on the second halves of the commissions because a salesperson's right to those payments accrues only upon conversion of the accounts—namely when the purchased computer system has been installed and is up and running. Because both accounts converted over six months after the company discharged Eungard, the company argues, the commissions could not have been "due to be paid at termination." Supporting this interpretation is the agreement's two-tiered commission-calculation inquiry, stating first that "closed orders . . . will be reviewed" and second that the "calculation of commission payments [will be] based on their status as of that date." The agreement, for these reasons, seems to contemplate further review of an order's "status" beyond the point it "close[s]." As far as we can tell, the only status change relevant to commission calculation beyond a client's signing (which determines whether an order is "closed") is an account's "conversion" point. Reading the conversion commissions to become "due" at signing thus arguably renders the agreement's reference to account "status" superfluous, running counter to the judicial preference for giving "meaning to all the terms" of a contract. *Century Sur. Co. v. Charron*, 583 N.W.2d 486, 488 (Mich. Ct. App. 1998).

But there are problems with this interpretation, problems that preclude it from being right as a matter of law. One problem is that it fails to explain why the same thinking should not govern the first halves of the commissions. Remember that the first halves of the commissions are not "schedule[d]" to be paid until one month after closing and thus would not have been "due" in this sense on July 2. Yet the company does not argue that it had no obligation to pay the first halves of the commissions on this basis, and we think there is a good reason why. That reading would reduce all of the provisions to this: On the day of termination, the company must pay a salesman all commissions it already had a duty to pay him and probably already would have paid him unless the commission happened to be scheduled for payment that day. Not only does that reading border on making the provisions pointless, but it also seems odd (and superfluous) to talk about "closed orders," commissions "to be paid" and so forth if that is what the provision does.

Another problem is that this interpretation gives the word "schedule" more content than it normally has. The company invokes the commission schedule not only to set the date when a salesperson can expect to receive payment but also to establish whether a salesperson's right to that payment has accrued. When something is "scheduled," that calendaring act generally affects only *when* that thing will happen, not *whether* it will occur. *See* Webster's Third New International Dictionary 2028 (2002) (defining "schedule" as "to appoint, assign, or designate to do or receive something at a fixed time in the future").

Each party presents extrinsic evidence supporting its view, but neither manages to settle the debate as a matter of law. Eungard points to evidence that at least one terminated employee received

a post-termination, conversion commission, but a jury might well credit the company's response that this payment was a clerical error. Eungard and the company dispute whether Area Vice Presidents have any significant role in marshaling an order from signing to conversion—an argument relevant to whether the parties considered the full commission as earned at signing or as compensation to be reaped through future effort. The company offers affidavits showing that there are "a number of duties remaining to be performed on contracts" after signing. But a jury could fairly find that the examples the affidavits give, such as "coordinating conference calls" and "resolving payment issues," are so insignificant that ordinary contracting parties would not hinge commission eligibility on them. Eungard's job description also fails to list post-signing duties and simply says that Area Vice Presidents must manage "sales prospects from initial contact *through contract execution*" rather than through conversion. (emphasis added). As these disputes are factual ones, we leave them for the jury to decide. When we construe these ambiguities against the drafter, Open Solutions, as we must, *see Cole v. Auto-Owners Ins. Co.*, 723 N.W.2d 922, 924 (Mich. Ct. App. 2006), we cannot say that the company has the better reading as a matter of law.

D.

*Were the Shared Resources Commissions Earned?* The company seeks partial summary judgment on the ground that Eungard did not perform sufficient work on the Shared Resources contract to earn either of the commissions on that account. Although the company claims that Kelly Bannevans "was the person who obtained the contract, not Mr. Eungard," Eungard contests this assertion with admissible evidence, claiming that he and Bannevans split the responsibilities on the account and "were to share the commission equally." The affidavit of Mark Wintzinger, AurGroup's CIO at the time, supports this theory because it says that the Shared Resources responsibilities were "handled" by both Eungard and Bannevans. A jury must resolve this material fact dispute.

III.

*Does Michigan Law Expand Eungard's Entitlement to Commissions?* Although we agree with Eungard that the district court should not have granted summary judgment to the company, we reject his arguments that he had a substantive right to commission payments not premised upon the terms of the contract. *First*, the Michigan Sales Representative Commissions Act creates remedial rights only to enforce "[t]he terms of the contract between the principal and sales representative," and the Act says that the contract "determine[s] when a commission becomes due." Mich. Comp. Laws § 600.2961(2); *see also APJ Assocs., Inc. v. N. Am. Philips Co.*, 317 F.3d 610, 616 (6th Cir. 2003) ("[T]he Act itself states that the parties' agreement will be held to define the scope of the obligation to pay commissions . . . ."). It is true, as Eungard points out, that the Act prevents employees from waiving their statutory rights. *See* Mich. Comp. Laws § 600.2961(8) (voiding any "contract between a principal and a sales representative purporting to waive any right under [the Act]"). But the Act does not grant every employee a right to post-termination commissions: It sets forth only a deadline for the payment of commissions that "become due after the termination date," *id.* § 600.2961(4), and no commission can ever become "due" if the written contract between the parties precludes it, *see id.* § 600.2961(2).

One Michigan Court of Appeals case, *Walters v. Bloomfield Hills Furniture*, 577 N.W.2d 206 (Mich. Ct. App. 1998), we recognize, held that a mid-employment contract improperly waived the employee's rights to post-termination commissions. *Id.* at 209. But Michigan courts have distinguished *Walters* and enforced contractual bans on post-termination commissions where the employer has not "subsequently changed th[e] terms" of employment and merely enforces certain "conditions" to which the employee agreed at the outset. *Gerard Thomas Co. v. Swanson*, No. 226163, 2001 WL 1335937, at *2 (Mich. Ct. App. Oct. 30, 2001). Because Eungard acknowledges

that this commission agreement was the same one given to him when he began his employment, he has no basis for extending *Walters* here.

*Second*, Michigan's "procuring cause" doctrine, *see generally Reed v. Kurdziel*, 89 N.W.2d 479, 483 (Mich. 1958), does not override these contractual terms either. In *APJ Associates*, we held that parties "may only obtain an award as the procuring cause of post-termination sales where the written agreement is silent," 317 F.3d at 616; *see also Muqtadir v. Micro Contacts, Inc.*, 148 F. App'x 348, 352 (6th Cir. Aug. 5, 2005), and that is not the case here.

*Finally*, Eungard's implied contract claim—premised upon McGourty's alleged promise that Eungard "would be paid [his] commission"—lacks merit. McGourty's statement provides no basis for concluding *which* commission payments would be paid, and of course at least one commission was paid. More fundamentally, "[a]n implied contract cannot be enforced where the parties have made an express contract covering the same subject matter." *Scholz v. Montgomery Ward & Co.*, 468 N.W.2d 845, 849 (Mich. 1991). The parties' express compensation agreement governs the entirety of Eungard's substantive claims, and we remand the case so that a jury may resolve the ambiguities in that contract.

IV.

For these reasons, we reverse.