## ARNOLD et al. v. NATIONAL ANILINE & CHEMICAL CO., Inc.

Circuit Court of Appeals, Second Circuit.
June 6, 1927.

No. 90.

1. Sales ⊕159—Failure to store comparatively small part of products sold in warehouse in buyer's name held not breach of contract.

Where contract for sale of egg products business included sale of approximately 400,-000 pounds of products on hand, seller's failure to store 47,850 pounds of such products in particular warehouse in purchaser's name, as required by contract, held not breach of contract, where products were stored apparently in seller's own name, but deliveries made without difficulty to seller.

2. Contracts ⊕94(1)—Under law of New York, fraud, whether it goes to factum or is antecedent to agreement, vitiates contract.

Under law of New York no form of contract can stand, if induced by fraud, whether the fraud shall have gone to the factum or shall have been made antecedent to the agreement.

3. Sales ⊕53(3)—Express provision against guaranty held not to entitle seller to directed verdict for price, if representations antecedent to execution of contract were shown to be fraudulent.

Where contract for sale of egg products business and stock, and for assignment of contracts with customers, provided that it was made "without any guaranty as to said contracts or sales," and that sales contracts were delivered "without prejudice," and further provided, "This memorandum contains all the terms of the sale herein involved, and * * * there is no warranty, express or implied, incident to the sale or other conditions not herein specifically stipulated," held, none of such quoted statements amounted to a statement that prior representations were not an inducement to the making of the contract, and hence, in seller's action for purchase price, where defendant pleaded fraud in representations inducing execution of contract, court improperly held that plaintiff was entitled to directed verdict, even assuming that such antecedent rep-

resentations were fraudulent, and improperly excluded proof of falsity.

**4. Evidence ☞434(11)—Contract held not equivalent to statement that representations antecedent to execution were not inducement to its making; hence parol evidence rule did not exclude proof of fraud therein.**

Where contract for sale of business and assignment of contracts with customers, "without any guaranty as to said contracts or sales" and "without prejudice," further provided, "This memorandum contains all the terms of the sale herein involved, and * * * there is no warranty express or implied incident to the sale or other conditions not herein specifically stipulated," *held*, none of such quoted provisions amounted to statement that representations antecedent to execution of contract were not an inducement to its making, and hence parol evidence rule did not preclude proof of fraud in such antecedent representations.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by the National Aniline & Chemical Company, Inc., against Harry E. Arnold and another, individually and as copartners doing business under the firm name and style of Arnold Bros., as successors of Arnold, Karberg & Co. Judgment for plaintiff, and defendants bring error. Judgment reversed, and new trial granted.

This case comes up on a writ of error sued out by the defendants in the court below, to review a judgment rendered against them in the District Court for the Southern District of New York for the sum of $398,834.10 upon a verdict directed by the trial judge.

The action was brought to recover the unpaid balance of the purchase price under a written contract of sale made between the National Aniline & Chemical Company, Inc., and Arnold, Karberg & Co., a partnership. The contract was for the sale of the business of National Aniline & Chemical Company, Inc. (hereafter called the plaintiff), in egg products, including its stock on hand and its uncompleted contracts with customers. These egg products are of Chinese manufacture. They consist of dried and finely divided yolk, albumen, and whole egg, and are used by bakers as substitutes for the natural fresh egg.

The defenses pleaded are:

(1) Nonperformance by the plaintiff, especially that the plaintiff had failed to transfer part of its stock agreed to be sold.

(2) That under the agreement between the parties the plaintiff warranted that the buyers in the transferred sales contracts were legally bound to purchase and take certain quantities of egg products; that approximately 8,658 pounds of flake albumen F. F. Z., 83,063 pounds of powdered albumen, 110,250 pounds of powdered egg yolk, 203,825 pounds of powdered whole egg, 17,600 pounds of granular egg yolk, and 34,450 pounds of granular whole egg (being an aggregate of approximately 397,846 pounds), had not, prior to the making of the agreement, been delivered to complete the sales contracts; that such warranties were false, many of the contracts had expired, some had been canceled, in some the buyers were entitled to a reduction in price, and others were for various reasons unenforceable.

(3) That in December, 1919, and January and February, 1920, the defendants negotiated with the plaintiff for the purchase by the defendants of the plaintiff's egg product business, good will, and unfilled sales contracts, and of its entire stock of egg products; that, during the negotiations, the plaintiff represented to the defendants that the plaintiff's stock of egg products consisted of approximately 1,173,826 pounds; that the plaintiff had firm sales contracts requiring for completion approximately 397,846 pounds; that the prices for the products required to fulfill these contracts averaged about 15 per cent. more than the prices to be paid by the defendants, and would yield them a profit of about $50,000; that the defendants were not allowed to examine the sales contracts, but were assured that the contracts were enforceable and in good order; that the business, sales contracts, and good will were worth much more than the stock of egg products taken separately; that the buyers were of good repute and financial standing; that neither the plaintiff nor any buyer was in default therein, and that no contract permitted a reduction in price in the event of a fall in the market; that these statements were false and made to deceive; that many of the sales contracts were unenforceable, or had been canceled, or had been extended, or permitted of price reduction, or were in a state of default, or the buyers were not of good repute and financial standing, and the business, contracts, and good will were not worth more than the stock of egg products taken separately; that the defendants relied on the false statements, were deceived thereby and, upon discovery of their falsity, refused to make further payments under the contract and (in their answer to the complaint) offered to make restitution as a condition of rescission.

The defendants also set up counterclaims based upon the alleged nonperformance breach of warranty and fraud.

The contract, bearing date December 31, 1919, and executed on February 10, 1920, provided in substance as follows:

(1) The seller assigns to the purchasers all the stock of egg products of the seller described in Schedule A annexed to the contract.

(2) The seller assigns to the purchasers all unfilled contracts and sales of egg products made to customers of the seller on and subsequent to date, "but without any guaranty as to said contracts or sales, except as hereinafter provided."

(3) Purchasers accept the merchandise and "assume all obligations imposed by said existing sales contracts and unfilled sales orders of the seller, except as hereinafter provided."

(4) Purchasers agree to pay as follows: $1,000, the receipt whereof is acknowledged. $911,202.20, being the balance of the purchase price at the rates per pound set forth in Schedule A, to be paid—$100,000 upon signing of the agreement and applied to the final payment of the price, one-sixth of the balance to be paid monthly thereafter.

"Should there be any surplus of powdered albumen or powdered whole egg after the completion by the seller of material to be delivered under existing sales contracts as hereinafter provided, the purchasers agree to pay for said surplus at the rate of $1.30 per pound for powdered albumen and 75 cents per pound for powdered whole egg.

"It is agreed that the quantities of merchandise as set forth in Schedule A are approximate only, although the seller believes them to be substantially accurate, but for any surplus in the amount of any of said products up to 10 per cent. thereof the purchasers agree to pay the seller at the rate stipulated in Schedule A."

Beyond this 10 per cent. prices to be subject to future agreement.

(5) The seller agrees to deliver, on receipt of the $100,000 deposit in advance, without prejudice, all contracts which it has with customers for the delivery of completed egg products. The seller further agrees to complete the preparation of the egg products for delivery under the contracts to provide containers, complete all mixtures, and to comply with regulations of the Department of Agriculture.

(6) All the products are to be at the risk of the buyers, except products which seller is to prepare for delivery under sales contracts. The products are to be stored by the seller in the name of the purchasers under negotiable warehouse receipts.

(7) Goods not of regular grade are to be returned and credited.

(8) "It is understood and agreed that this memorandum contains all the terms of the sale herein involved and that there is no warranty, expressed or implied, incident to the sale or other conditions not herein specifically stipulated."

The plaintiff put in its case. Thereupon the defendant offered evidence that certain representations were made by plaintiff's agents prior to the execution and delivery of the foregoing contract, of which the following were the most important:

(a) The plaintiff had firm sales contracts for 397,846 pounds; the undelivered quantities stated in the first division of Schedule A of the contract were not approximate, but accurate, and the buyers under such contracts were legally bound to purchase such quantities, and had no price reduction privileges, and neither the plaintiff nor any of the buyers under the contracts were behind in any of their obligations thereunder, or had any disputes as to the same.

(b) The sales contracts were with houses that the plaintiff had dealt with for a number of years, and these were good, reputable concerns, financially able.

Now the sales contracts were an important element of the main agreement, because the egg products covered by them were at substantially higher prices than the surplus products to be purchased by the defendants.

The court assumed that the foregoing representations as to these contracts, which the defendants' witness Reilly testified had been made, were false, and said at page 500 of the record on appeal:

" * * * Where a witness testifies to certain representations, and the point is made that those representations are not material, because they do not involve fraud, it must be assumed that those representations are false. I am assuming that everything he has said is false; * * * and I take it that, at least by the great weight of law, false representations, in order to constitute fraud, must be in regard to things of such a character as are not clearly contemplated and provided for by the contract. Now, then, Mr. Reilly testified that there were many matters—that all these matters and things were the subjects of lengthy correspondence and lengthy conference, and following upon all that there is, in the first place, a letter from Mr. Reilly or his firm to the plaintiff, which is silent upon all these matters, except the matter of credit; and then, all of these matters having been discuss-

ed, a contract is prepared, which is not alone silent upon the matters that Mr. Reilly speaks about, but in many places and by its specific terms it excludes them. In the first place, there is the specific provision in the second clause of the contract that seller assigns and sets over unto the purchasers all unfilled contracts and sales of egg products made to customers of the seller on and subsequent to this date, but without any guaranty as to said contracts or sales except as hereinafter provided.

"Now, then, you go over to paragraph or clause 4 of the contract, wherein it is specifically agreed that the quantities of merchandise as set forth in Schedule A are approximate only, although the parties believe them to be substantially correct. Now, Schedule A contains the number of pounds, by various subdivisions, of this product which are to be delivered against sales contracts; but it goes on still farther and provides that, for any surplus in the amount of said products up to 10 per cent., the purchasers agree to pay the sellers at the rates stipulated in Schedule A; but, if the surplus is in excess of 10 per cent., they were to endeavor to agree, if they could, and, if not, the deal was off as to them. Now, they were not content even with that, and they provide again in the eighth clause of the contract: 'It is understood and agreed that this memorandum contains all the terms of the sale herein involved, and that there is no warranty, expressed or implied, incident to the sale, or other conditions not herein specifically stipulated.'

"I am satisfied, gentlemen, that all of the representations testified to by Mr. Reilly—and I have examined each one of them carefully—amounts to no more than what would constitute in law a warranty in regard to those contracts, and that that warranty is specifically excluded."

Mr. Steuer, the defendants' counsel, thereafter said, at page 503:

"* * * I wish to specifically request that this case be submitted to the jury upon the issue as to whether or not the representations testified to by Mr. Reilly were made, and as to whether those representations were false; and also we wish to be permitted to submit evidence as to the damages sustained by us by reason of the falsity of these representations. I am not overlooking the element of knowledge on the part of the plaintiff of their falsity, or that they relied upon them, and that it was in reliance upon them that we executed the contract. We ask that all of the issues in the case as framed by the pleadings be submitted to the jury for determination,

and we ask for leave to call our witnesses in order to substantiate the allegations of the answer. But we want to be fair with the court, and we reiterate our statement that as to the making of the representations we have furnished the court all the evidence that we have."

Thereupon the court denied leave to go to the jury and directed a verdict for the plaintiff for the unpaid balance due under the contract in the sum of $398,834.10.

[1] In respect to the defense of nonperformance there was no sufficient proof. There was apparently a failure to store 47,850 pounds of the egg products in the warehouse of Griswold & Walker in Chicago in the purchaser's name, but Plaintiff's Exhibit 47 indicates that direction was given by the seller to its Chicago office to do this, goods were placed there to that amount, the purchasers paid insurance and warehouse charges thereon, and there was no difficulty in securing delivery whenever desired. Such a trifling irregularity as to only 5 per cent. of the subject-matter of the contract could constitute no breach.

There was no proof or offer to prove the defense of breach of warranty. It is contended by the defendants that there was a warranty of the sales contracts in respect of the quantities set forth in Schedule A. This contention is made in spite of the omission in the final agreement of the parties of any guaranty of certain quantities applicable to sales contracts such as was proposed in a tentative agreement of December 29, 1919. The contention also disregards the provisions of the final agreement that the sales contracts were assigned, "without any guaranty as to said contracts or sales, except as hereinafter provided"; that the seller was to deliver all contracts to the purchasers "without prejudice," and that the agreement "contains all the terms of the sale, * * * and that there is no warranty, express or implied, incident to the sale, or other conditions not herein stipulated." No warranty of the quantities to be delivered under the sales contracts appears anywhere in the agreement. The words "except as hereinafter provided" related to the duty of this seller to complete the preparation of egg products to be delivered under sales contracts as provided in clause fifth of the agreement. The provision of clause fourth that "the quantities of merchandise as set forth in Schedule A are approximate only, though the seller believes them to be substantially accurate," does not relate to the egg products to be delivered against sales contracts, but to the totals of the various products. This is clear, because the

prices of surplus products of powdered albumen and powdered whole egg mentioned in clause fourth are fixed upon the assumption that these products may exceed the amounts thereof set forth in the first part of Schedule A as deliverable under the sales contracts. Such products are not mentioned in the second part of the schedule under "surplus materials," and could only become "surplus materials" if the sales contracts in these products failed in part. Moreover, absence of any guaranty as to the approximate amount required to fulfill sales contracts is one of the marked differences between the final agreement of the parties and the arrangement proposed by the purchasers in their letter to the seller of December 29, 1919 (Defendant's Exhibit D–47), where it was said that the amounts stated "represent fairly accurately the amounts you have sold and still have to deliver."

In support of the defense of fraud there was some proof on cross-examination of the plaintiffs' witnesses and in defendant's case that the Wagner and Noggle sales contracts were short about 20,000 pounds, and that the Ferris contract for 2,200 pounds had expired, and there was an offer to prove that the Kuhnle and Schaefer contracts for 34,000 pounds had been canceled. These formed a considerable percentage of the total amount of sales contracts. There was proof that the Loose-Wiles Biscuit Company's contract contained a price reduction clause, and by the refusal of the court to allow the defendants to offer further evidence there was in effect a denial to them of the right to show that numerous sales contracts itemized in the bill of particulars were with concerns of poor credit and bad financial condition.

The defendants were not allowed to have a list of the contracts or know their terms until the agreement between the parties actually went into effect.

Evarts, Choate, Sherman & Leon, of New York City (Joseph H. Choate, Jr., Herbert J. Bickford, and Max D. Steuer, all of New York City, of counsel), for plaintiffs in error.

Francis H. McAdoo, of New York City (Isidor J. Kresel and Bernard Hershkopf, both of New York City, of counsel), for defendant in error.

Before MANTON and L. HAND, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

AUGUSTUS N. HAND, District Judge (after stating the facts as above). The assumption of the court that the representations were false makes it impossible to determine how material was the falsity of the representations, or what loss the defendants incurred by taking over sales contracts which may not have been anything like what on their face they seemed. It may be that the situation, if it had been properly developed, was such that no question of fraud could have been properly submitted to a jury. But the court assumed that the representations said to have been made as an inducement to the execution of the contract were false. If false to a substantial extent, there might arise the inference that they were made with the intention to deceive. The defendants were cut off from proving all that had or might have occurred, upon the theory that they were precluded from so doing by the provisions in the second article of the contract that the unfilled contracts were assigned "without any guaranty as to said contracts or sales" in the fifth article, that all sales contracts were delivered "without prejudice," and by the eighth article that "this memorandum contains all the terms of the sale herein involved and * * * there is no warranty, expressed or implied, incident to the sale or other conditions not herein specifically stipulated."

In the proposal of December 29, 1919, the defendants said that the stated amounts of the sales contracts, though approximate, represented "fairly accurately the amounts you have sold and have still to deliver," and also that, though the plaintiff assumed no responsibility for the fulfillment of the sales contracts, yet it assured the defendants "that the concerns whose names appear in these contracts are all firms of good repute and satisfactory standing." These provisions were omitted in the final contract, and the careful provisions guaranteeing nothing were substituted. But the evidence leaves the case in a position, not only where there is proof, or offer of proof, of cancellation of some of the sales contracts before the main contract was executed, and of a provision for price reduction in another. There is also an indefinite field for proof that the sales contracts were with concerns of weak credit.

The court, by declining to hear evidence as to whether the representations testified to by Reilly were false, assumed (as the judge said) that they were so. Consequently no limit can be set to how bad was the financial standing or condition of concerns with which the plaintiff had sales contracts. If in fact a great proportion of the sales contracts were with concerns of bad financial rating, and the

plaintiff had represented that their rating was excellent and their credit good, then the question would arise whether these representations were not made to deceive, and were not an inducement to the making of the contract between the parties.

All the evidence bearing on the truth and extent of the misrepresentations should have been before the court, unless the question of fraud could not legally be considered by reason of the terms of the contract. Our consideration, therefore, reduces itself to whether, irrespective of fraudulent inducement, the provisions of the contract are controlling.

Now there are decisions which hold that, where one declares in his contract that every representation to which he will undertake to hold the opposite party is embodied in the agreement, no fraud which does not enter into the execution of the contract can avail either as a defense or as ground for an independent action. This seems to be the doctrine of the Massachusetts courts. Colonial Corporation v. Bragdon, 219 Mass. 170, 106 N. E. 633; O'Meara v. Smyth, 243 Mass. 188, 137 N. E. 294; J. I. Case Threshing Machine Co. v. Broach, 137 Ga. 602, 73 S. E. 1063. But even the Massachusetts courts have held that a provision in an insurance policy that it shall be incontestable from any cause is invalid as against public policy, where the inducement is fraudulent. Reagan v. Union Mutual Insurance Co., 189 Mass. 555, 76 N. E. 217, 2 L. R. A. (N. S.) 821, 109 Am. St. Rep. 659, 4 Ann. Cas. 362. They also hold that fraud as to the subject-matter of the contract will vitiate it, and if the subject-matter sold is not the piece of property exhibited prior to the execution of the contract a recital that the statements inducing its execution are all included in the writing afford no protection. Butler v. Prussian, 252 Mass. 265, 147 N. E. 892.

[2] But while the Massachusetts doctrine observes exactly the agreement of the parties, decisions of the courts of the state of New York and of England, as well as the weighty authority of Williston and Wigmore, seem to hold that no form of contract can stand, if induced by fraud, whether the fraud shall have gone to the factum or shall have been antecedent to the agreement. Haight v. Hayt, 19 N. Y. 464; Bridger v. Goldsmith, 143 N. Y. 424, 38 N. E. 458; Universal Fashion Co. v. Skinner, 64 Hun, 293, 19 N. Y. S. 62; S. Pearson & Son, Ltd., v. Lord Mayor, etc., of Dublin [1907], A. C. 351; Williston on Contracts, § 811; Wigmore on Evidence (2d

20 F.(2d)—24

Ed.) § 2439. See, also, Barnes v. Union Pacific Ry. Co. (C. C. A.) 54 F. 87.

The divergent authorities referred to are based on conflicting ideas of public policy. 25 Columbia Law Review, 231. The Massachusetts cases emphasize the desirability of certainty in the contractual relations of those who have made a definite agreement, and if they say that they contract without regard to prior representations and that prior utterances have not been an inducement to their consent, any occasional damage to the individual caused by antecedent fraud is thought to be outweighed by the advantage of certainty and freedom from attacks, which would in the majority of cases be unfounded where such provisions were in the agreement.

The contrary decisions are based upon a greater consideration for the individual who may suffer wrong through deliberate fraud. It is worth remembering that the ingenuity of draftsmen is sure to keep pace with the demands of wrongdoers, and if a deliberate fraud may be shielded by a clause in a contract that the writing contains every representation made by way of inducement, or that utterances shown to be untrue were not an inducement to the agreement, sellers of bogus securities may defraud the public with impunity, through the simple expedient of placing such a clause in the prospectus which they put out, or in the contracts which their dupes are asked to sign. See Industrial, etc., Trust v. Tod, 180 N. Y. 215, 73 N. E. 7.

[3] But, whether or not fraudulent representations antecedent to the execution of a contract can be properly cured by a clause that they were not an inducement to the making, the provisions in the contract in suit do not afford such protection. The provisions of the second article that the unfilled sales contracts were assigned "without any guaranty as to said contracts or sales," of the fifth article that all sales contracts were delivered "without prejudice," and of the eighth article that "this memorandum contains all the terms of the sale herein involved and * * * there is no warranty express or implied incident to the sale or other conditions not herein specifically stipulated," are none of them equivalent to a statement that the prior representations (assumed at the trial to have been untrue) were not an inducement to the making of the contract. The statement that the written contract contains all the terms and that there is no warranty not specifically set forth in it does not purport to exclude causes of action for fraud, if there was any.

It is perfectly true that the vendor did not agree to be responsible for anything not set forth in the writing and guaranteed nothing not specifically provided. But had the vendor agreed to other things or warranted other facts, that would only have meant that the vendee might have recovered damages for the breach or might have rescinded the contract upon the failure of the vendor to fulfill its promises. When the vendor says it does not warrant, it merely means that it asserts nothing to be true for which it will be responsible in these ways. The writing constitutes the agreement of the parties, and the vendee has no rights under it other than those given by its terms. It may have been induced to go into it by antecedent statements which have turned out to be incorrect, but if the promisor has agreed to nothing not covered by the instrument the vendee can have no remedy under the contract merely because some prior representations were wrong. If, however, it can prove that the vendor has knowingly deceived it, that the deceit was an inducement to the contract, and that it relied upon it to its damage, the situation is quite different. [4] The parol evidence rule has nothing to do with such a case. Preeman v. United States (C. C. A.) 244 F. at page 12; Callanan v. Keessville, etc., R. R. Co., 199 N. Y. at page 286, 92 N. E. 747; Adams v. Gillig, 199 N. Y. at page 319, 92 N. E. 670, 32 L. R. A. (N. S.) 127, 20 Ann. Cas. 910; Professor Wigmore's explanation of the inapplicability of the parol evidence rule is that: "It is impossible to suppose that the subject of fraud was intended * * * to be covered, since by hypothesis the party upon whom the fraud is practiced does not know of it and therefore could not have had such an intent." Wigmore on Evidence (2d Ed.) § 2439.

Whether this is the explanation, or perhaps the more simple one, that the law will not allow a man to profit by his own wrong, is unnecessary to determine; but it seems clear that such clauses as are contained in the contract under consideration do not preclude a defense of fraud. As the fraud was assumed by the court, the defendant was not entitled to a direction of a verdict. The whole evidence bearing upon the question should have been taken, so that the court, with everything before it, could decide whether or not there was a question for the jury.

Because of the failure to do this, the judgment should be reversed, and a new trial granted.

MANTON, Circuit Judge, dissents.