### GREEN BAY AUTO DISTRIBUTORS, Inc. v. WILLYS–OVERLAND MOTORS, Inc.

Civ. No. 6512.

United States District Court
N. D. Ohio, W. D.
Dec. 28, 1951.

See also, D.C., 11 F.R.D. 549.

Smith & Ells, Toledo, Ohio, for plaintiff.

Milton C. Boesel, Toledo, Ohio, for defendant.

KLOEB, District Judge.

This matter is before the Court on motion of defendant for summary judgment, directed to the first and second causes of action of the second amended complaint, on the ground that the said complaint fails to show that there is a genuine issue as to any material fact and that the defendant is therefore entitled to judgment as a matter of law.

The motion is governed by the provisions of Rule 56, Fed.Rules Civ.Proc., 28 U.S. C.A., which provides:

"(b) A party against whom a claim, * * * is asserted * * * may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

"(c) * * * The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, *show that there is no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law. * * *" (Emphasis added.)

This rule was construed in Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 1942, 130 F.2d 1016, at page 1018 and the Court there said: "It is now well settled that summary judgment may be entered for either party if the pleadings, depositions, admissions on file and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Civil Procedure Rule 56. Stated conversely, a substantial dispute as to a material fact forecloses summary judgment. McElwain v. Wickwire Spencer Steel Co., 2 Cir., 1942, 126 F.2d 210; Miller v. Miller, 1941, 74 App.D.C. 216, 122 F.2d 209; Whitaker v. Coleman, 5 Cir., 1940, 115 F.2d 305. Upon a motion for a summary judgment it is no part of the court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried.

Ramsouer v. Midland Valley R. Co., D.C. Ark., 1942, 44 F.Supp. 523. All doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for a summary judgment. Weisser v. Mursam Shoe Corporation, 2 Cir., 1942, 127 F.2d 344 [145 A.L.R. 467]."

In the case of Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, at page 627, 64 S.Ct. 724, at page 728, 88 L.Ed. 967, the Court said on this subject: "The Court of Appeals below heretofore has correctly noted that Rule 56 authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try. American Insurance Co. v. Gentile Brothers Co., [5 Cir.] 109 F.2d 732; Whitaker v. Coleman, [5 Cir.] 115 F.2d 305. * * *"

It appears from the allegations of the second amended complaint that, on August 31, 1945, the plaintiff entered into an exclusive "Distributor Sales Agreement" with the defendant, which was intended to cover the distribution by plaintiff of motor vehicles, parts, accessories and equipment manufactured by the defendant, in twenty-four counties in Wisconsin and fifteen counties in Northern Michigan, a copy of which contract is attached to the second amended complaint as Exhibit A.

It is alleged that the plaintiff met the conditions preliminary to the execution of the contract imposed upon it by the defendant, including acquiring a building in Green Bay, Wisconsin, for the purpose of housing sales and display facilities, a parts and accessory department and a service garage, in conformity to plans and specifications of the defendant, and, in doing so, the plaintiff expended large sums of money.

The first cause of action alleges that, as an inducement to plaintiff to enter into the said distributor sales agreement, the defendant, through George Harold Bell, its Director of Sales, and other executives, employees and agents, made the following representations to plaintiff:

1. That it "had developed a two-door five-passenger sedan on short wheel base, with economical fuel consumption, superior riding qualities and advanced styling for introduction into the large post-war low-priced motor vehicle market;";

2. That "said passenger sedan was engineered, tested, approved and ready for production,";

3. That "said sedan was designed to be delivered in the One Thousand Dollar ($1,000.00) to One Thousand Two Hundred Dollar ($1,200.00) price class;";

4. That "high volume production of said post-war two-door five-passenger sedan would begin as soon after the cessation of World War II as tooling could be completed and materials were available.";

5. That defendant "would build up its production to three hundred thousand (300,000) motor vehicles per year within three years, most of which would be two-door five-passenger sedans;".

The plaintiff further alleged that the said passenger automobile "was not placed in production as represented". It also alleged that the said representations "were false and were made for the fraudulent purpose and intention of inducing plaintiff to enter into and to continue in said exclusive distributor sales agreement;"; that defendant "at no time intended to produce a conventional five-passenger vehicle as represented;"; that plaintiff "was misled and fraudulently deceived by the aforesaid misrepresentations inducing plaintiff to enter into said exclusive distributor sales agreement"; that plaintiff "relied and acted upon all of said false and fraudulent representations and promises to manufacture and deliver to plaintiff said two-door five-passenger sedan"; and that plaintiff suffered damages in loss of business and profits thereby in the sum of $200,000.

For a second cause of action plaintiff alleged that it duly performed all of the terms and conditions of said distributor sales agreement on its part to be performed, and utilized its entire facilities, personnel, capital and credit, in distributing the defendant's Jeeps and Jeep-type motor vehicles in

large numbers at retail and at wholesale, and that the defendant "arbitrarily, wrongfully, without just cause and in bad faith" cancelled plaintiff's exclusive distributor sales agreement, causing injury and damage to plaintiff in loss of business, capital investment and profits in the sum of $100,000.

The contract contains the following pertinent provisions with reference to rights of cancellation, the superseding of all prior negotiations, representations and understandings, and its construction according to the laws of the State of Ohio, which govern the rights of the parties thereto: "21. Duration, Termination and Cancellation—This Agreement supersedes any and all sales agreements between the parties hereto and shall continue in force and govern all relations and transactions between the parties hereto until cancelled or terminated. It is agreed that either party shall have the right to cancel and terminate this agreement at any time upon thirty (30) days written notice to the other party, given by Registered Mail or personal delivery thereof, and such cancellation shall operate as a cancellation, as of the date of such notice, of all unfilled orders and requisitions. * * *"

The sales agreement in question, in paragraph 24 thereof, has a provision which is important as bearing upon the right of action, if any, of the plaintiff against the defendant based upon representations or understandings made prior to the date of the agreement, reading as follows: "24. Prior Memoranda Superseded Hereby—There are no verbal agreements, representations or understandings affecting this agreement or any supplement thereto or the subject matter thereof, and all negotiations, representations and understandings are merged herein, and this agreement supersedes, cancels and annuls all contracts, understandings and agreements of prior date between the parties hereto and shall continue in force and govern all transactions between the parties hereto until the expiration hereof or the cancellation or termination hereof by either party, and Distributor hereby releases and forever discharges Manufacturer, from any claims, demands, or causes of action which it may have against it arising out of or by reason of any matter or thing occuring pri-

or to the date hereof, except as to credits heretofore approved and allowed in writing by Manufacturer arising under any preceding agreement in effect at the time of execution of this agreement. * * *"

The agreement contains the following clause as to under the laws of what State the contract should be construed:

"27. * * * It and all of its terms shall be governed by and construed according to the laws of the State of Ohio; * * *."

There have been filed on behalf of plaintiff on this motion the affidavits of Albert Ginsberg, president and principal shareholder of plaintiff, and George Harold Bell, who was sales manager for defendant prior to and at the time the agreement sued upon was entered into.

The affidavit of Mr. Ginsberg states, in substance, that, during the latter part of the year 1944, he took up negotiations with the defendant with the aim of securing a distributorship for its motor vehicles for Northern Wisconsin and received a letter from Mr. Bell, defendant's General Sales Manager; that, in the course of the negotiations, on or about August 9, 1945, Mr. Bell represented to him that Willys-Overland as its first postwar products was coming out with a civilian Jeep, an all steel body Jeep station wagon and a line of Jeep trucks; that Mr. Bell stated, with reference to a conventional passenger car "that the company was definitely coming out with a small conventional passenger sedan; that the company had completed most of the engineering and design work on its small conventional passenger sedan and that the date of going into production would depend in large part upon the availability of steel and other materials; that a 'mock-up' model of the passenger car was complete as were several engineering features of advanced design; that the passenger car would be powered with either a four or six cylinder engine, the latter having been completely engineered and tested; that the company would build its yearly production up to 300,000 units annually, at least 200,000 of which would be conventional passenger car units; that with such volume the entire

line would undersell anything on the market."

Mr. Ginsberg further stated that he asked to see the model of the new small conventional passenger car and that Mr. Bell had deponent taken to a building across the street from the main office building of defendant where he was shown a plaster full sized model of a conventional two-door sedan; that thereafter deponent told Mr. Bell he was sold on the Willys-Overland postwar program and would return to Green Bay that night and complete all arrangements to meet their requirements, and details in his affidavit the things he did in pursuance thereof. He further stated that his relations with Willys-Overland proceeded "on a sound, amicable and mutually profitable basis until the latter part of the year 1948". (The agreement continued in force until it was cancelled by defendant by letter received by plaintiff on December 20, 1949.)

As to his knowledge of the intention of the defendant not to manufacture a conventional passenger car, Mr. Ginsberg stated that "he first learned that Willys-Overland had been deceiving its distributors, and that it had never intended to manufacture a conventional passenger car as represented to all distributors shortly after March 30, 1950, slightly more than two months after the cancellation of his contract by Willys-Overland had become effective, when he received a copy of the Toledo Blade which reported the speech of Delmar G. Roos, at that time acting president of Willys-Overland, who told a gathering of distributors and dealers that the company's many previous announcements concerning a conventional passenger sedan had not been made with any intention of placing such car in the company's production program, but that now, since the previous management had been replaced, the company was actually going to produce such a car which would be ready early in 1951; * * * that plaintiff would not have signed the exclusive sales agreement nor provided the capital, facilities and personnel to perform such agreement but for Willys-Overland's promises to manufacture and produce a postwar conventional passenger car."

As to the subject of the cancellation of the plaintiff's agreement, Mr. Ginsberg stated in his affidavit that his contract was cancelled by defendant by a letter which he received on December 20, 1949, after his refusal to consent to a cancellation of his exclusive distributor sales agreement.

There are attached to this affidavit Exhibit A, a photostatic copy of part of the Annual Report of Willys-Overland Motors, Inc. for the year ending September 30, 1945, and Exhibit B, photostatic copy of the first page of the Toledo Blade of March 30, 1950.

The affidavit of Mr. Bell consists almost entirely of the inclusion of a copy of a letter which he wrote on April 20, 1951 to Mr. Boesel, of counsel for defendant, in response to a letter asking for information regarding the facts involved in this law suit, dated April 12, 1951. In that letter he stated, in substance, that "the company's projected building program" was scheduled to reach 300,000 units in a relatively short time—"as soon as the flow of raw materials would permit it"; that "This volume, of course, embraced Barney Roos's new two-door sedan which it was anticipated would sustain the company's manufacturing volume as the Jeep market leveled off after the necessity-transportation buyers dwindled."

As to his negotiations with Mr. Ginsberg, he stated: "It is true that I handled all of the negotiations with Ginsberg and after receiving assurances from him that he would furnish such capital as the factory deemed necessary and that he would build us a new building and properly handle our account, we made him an exclusive Willys distributor for Northern Wisconsin and later certain specified counties in the Upper Peninsual of Michigan. If my memory serves me correctly, I first met Ginsberg at Chicago in 1944, at a time when I interviewed a considerable number of applicants for distributorships. Ginsberg came to Toledo on a number of occasions after that, and I am reasonably certain that he was introduced at one time or another to most of our then top executives, as I always made it my business to treat all prospective distributors with courtesy and deference and

to introduce them to our key people. * * *" (Emphasis added.)

As to his discussions with prospective distributors (presumably including the plaintiff), involving the production of a small conventional two-door sedan, Mr. Bell stated: *"The subject of the planned production of a small conventional two-door sedan was discussed and stressed with all prospective distributors. As a matter of fact, it was the chief subject of discussion at all times.* With a few possible exceptions, I cannot recall a single prospective distributor who was willing to gamble the necessary $100,000 to $200,000 investment on the prospects of the Jeep alone. I was certainly in agreement with them in my own mind, because I never considered the Jeep and the Jeep line as being a satisfactory 'permanent' product line through which Willys Overland could 'cash-in' and retain the splendid reputation it made as a producer of war material." (Emphasis added.)

It would not appear from Mr. Bell's affidavit that there was any lack of good faith on his part or on the part of the defendant at the time of the negotiations, but rather the contrary. He states that the production of a small conventional two-door sedan was the chief subject of discussion with all distributors; that he made his position on this very clear at many meetings; and that, with his assistance, Mr. Hopkinson, who apparently was Vice President and Treasurer, prepared a report on the company's postwar possibilities, which was presented at a Board meeting in the Autumn of 1944, which told of the postwar plans of the company and urged concentration on the passenger car field. Mr. Bell further stated that he remembered "that development work on the passenger car went forward and that tooling and material requirements dictated that the company produce the Jeep until such time as the passenger car could be manufactured"; that the Engineering Division, under the guidance of Barney Roos, completed a first proposed postwar two-door, five-passenger sedan early in 1944, which was set up on the second floor of the Research Building, and that this car was shown from time to time to selected distributor applicants to convince them that they were going into the passenger car field and to obtain their reaction as to its saleability.

It appears from the sales agreement (Exhibit A to the complaint) that the defendant in paragraph one granted to the plaintiff "the exclusive privilege of selling at wholesale, * * * the Manufacturer's automotive products and its parts and accessories (in accordance with its then current parts policy) within the territory described in Schedule 1 hereto attached and made a part hereof."

It further provides that the distributor has "the privilege of selling at retail new Willys-Overland products specified in Schedule A * * *" within the limits of Green Bay, Wisconsin. Schedule 1 lists twenty-four counties in Wisconsin and fifteen counties in Michigan, opposite which is the "Estimated Unit Allotment" for each, totaling 1333 units. Temporary Schedule A attached provides, with reference to the products of the defendant agreed to be taken by the distributor, as follows:

"(A) It is agreed between the Manufacturer and the Distributor that the estimated requirements for the territory assigned under this Agreement shall be 1333 units for the period of twelve months from the date when the Manufacturer resumes shipment of motor vehicles for civilian consumption."

"(B) The Distributor agrees to place firm orders with the Manufacturer and pay for and accept delivery of motor vehicles in body types which the Manufacturer is able to ship. It is understood and agreed, however, that the number of motor vehicles which the Manufacturer shall ship in any one month will not exceed ten percent (10%) of the Distributor's requirements for twelve months."

The 1333 units above mentioned would seem to refer to the Jeep type vehicles then manufactured by the defendant. No mention is made in the agreement of a new passenger sedan to be manufactured and delivered by the defendant in the future.

The plaintiff was so well satisfied with this agreement the business under which, as above quoted, Mr. Ginsberg said was "on a sound, amicable and mutually profitable, basis until the latter part of the year 1948", that it felt itself aggrieved when the defendant, pursuant to the express terms of paragraph 21 of the agreement, cancelled the same on or about December 20, 1949, and for which it is asking damages in this case. It seems likely that had the agreement not been cancelled this action would not have been brought.

### The First Cause of Action

The first cause of action is based on the alleged fraud and deceit of the defendant in fraudulently inducing the plaintiff to enter into the distributor sales agreement set up in this case by oral promises which it did not intend at the time to perform. It is not a cause of action on contract, based on the failure of the defendant to perform an oral promise to do something in the future which would be covered by the written agreement between the parties; evidence of such an oral agreement would be inadmissible under the parol evidence rule, and in our opinion the authorities cited on that point of law are not applicable to the issue involved here. The tort here alleged consists in the fraudulent representation of an intention to do something, not mentioned in the written agreement, in order to induce the making of the agreement by the plaintiff. The misrepresentation alleged consists of representing to plaintiff, as an inducement to its entering into the agreement, that the defendant intended to manufacture a new passenger car which the plaintiff would have the opportunity to handle as distributor under its distributor sales agreement, when at the time the defendant had no such intention. Representations and promises made after the making of the written agreement are manifestly not pertinent to this issue.

The law upon which the plaintiff bases this cause of action is quoted by counsel for plaintiff in their brief as follows:

" * * * According to the weight of authority, if the person making the promise or statement as to a future event is guilty of an actual fraudulent intent, and makes the promise or misrepresentation with the intention of deceiving and defrauding the other party, and accomplishes this result, to the latter's injury, fraud may, under many circumstances, be predicated thereon, notwithstanding the future nature of the representations. * * *"

"The weight of authority holds that fraud may be predicated on promises made with an intention not to perform the same, or, as the rule is frequently expressed, on promises made without an intention of performance. It has been said that when a promise is made, the promisor, by necessary implication, asserts a present and bona fide intention to perform, and if, therefore, the intention to perform does not exist, there is a misrepresentation of a fact upon which fraud may be predicated, the gist of the fraud in such a case being not the breach of the agreement to perform, but the fraudulent intent of the promisor and the false representation of an existing intention to perform, when such intent did not in fact exist; * * *."

(Note in 51 A.L.R., page 63. See also 23 Am.Jur., par. 37, page 798, to the same effect.)

The law of Ohio as to what it is necessary to prove to recover in an action for fraud or deceit is stated in Lucke v. Robison & Co., Inc., 1937, C.A. Lucas County, 56 Ohio App. 242, at page 244, 10 N.E.2d 283, at page 284, as follows:

"The action being one based upon alleged false and fraudulent representations, the elements required to be proved to entitle plaintiff to recover are: (1) That there was a representation as to an existing or past fact, material to the transaction; (2) that such representation was false at the time it was made; (3) that the representation was made in bad faith with knowledge that it was false; (4) that it was made with the intent of misleading plaintiff into relying upon it; (5) that plaintiff must have relied upon the representations with a right to so rely; and, (6) injury must have resulted as a consequence of such reliance.

"All of these ingredients must be found to exist, and the absence of any of them is fatal to a recovery. 19 Ohio Jurisprudence 336, and cases there cited."

The alleged false representations of defendant may be separated into statements of existing facts and promises of future performance. The statements of existing facts are:

(1) that the defendant "had developed a two-door five-passenger sedan on short wheel base, with economical fuel consumption, superior riding qualities and advanced styling for introduction into the large post-war low-priced motor vehicle market";

(2) that "said passenger sedan was engineered, tested, approved and ready for production";

(3) and that "said sedan was designed to be delivered in the One Thousand Dollar ($1,000.00) to One Thousand Two Hundred Dollar ($1,200.00) price class".

Mr. Ginsberg, in his affidavit, states that he was shown a model of the passenger car and some of its mechanical features, and it appears, so far as indicated, that he was satisfied with it and returned to Green Bay to complete arrangements to meet the requirements of the defendant to act as distributor.

The promises of future performance alleged are:

(1) that "high volume production of said post-war two-door five-passenger sedan would begin as soon after the cessation of World War II as tooling could be completed and materials were available"; and

(2) that defendant "would build up its production to three hundred thousand (300,-000) motor vehicles per year within three years, most of which would be two-door five-passenger sedans".

It is on these alleged representations that this cause of action is based. Plaintiff alleges these representations were false, were made for the purpose of inducing the plaintiff to enter into the said exclusive distributor sales agreement; *that defendant at no time intended to produce a conventional five-passenger vehicle as represented;* and that plaintiff was misled and deceived by the said misrepresentations to enter into said agreement; and that plaintiff relied and acted upon said representations to its damage.

The gravamen of this complaint, therefore, is that defendant, at the time plaintiff was induced to enter into the agreement by reason of those representations, had no intention to produce a post-war passenger car as represented.

Mr. Bell in his affidavit states that he handled all of the negotiations for an agreement to act as distributor with the plaintiff, and Mr. Ginsberg in his affidavit seems to confirm this. Nowhere in the affidavit of Mr. Bell is there any statement that he made any representation as to future manufacture and delivery of the two-door five-passenger sedan they discussed with intent to deceive the plaintiff or that he did not intend that his principal, the defendant, should perform. There is nothing in his affidavit but evidences his entire good faith in dealing with the plaintiff.

On a motion for summary judgment, the court will take the affidavits submitted thereon at face value. Begnaud v. White, 6 Cir.,1948, 170 F.2d 323.

We do not believe the position of the plaintiff is helped by Exhibits A and B, attached to the affidavit of Mr. Ginsberg. Exhibit A is a copy of the Annual Report of the defendant for the year ending September 30, 1945, two days after the plaintiff's Distributor Sales Agreement was executed by defendant. It clearly indicates the policy and intention of the defendant at that time with regard to a new passenger car. It states:

" * * * Lastly, there will be an entirely new passenger car designed for sale in the low priced field.

" * * * A completely new, low cost, small passenger car, embodying features and basic improvements never before offered in a car in this class has been designed, engineered, developed and thoroughly proved. Your management is confident that this revolutionary small passenger car, along with the other motor vehicle offerings, will enjoy an unprecedented degree of mass public acceptance."

Exhibit B attached to the affidavit is a copy of the first page of the "Toledo Blade" dated March 30, 1950, in which the following appears:

"Some 2,000 dealers over the nation also heard Mr. Roos disclose that W-O will put on the market a new conventional, 5-passenger automobile early in 1951."

"The speaker declared no actual passenger car program was provided in the company's policy until last May when new management took over."

There is nothing in the statement of Mr. Roos, quoted, if admissible, which to our mind indicates that at the time the negotiations for the agreement here were in progress the defendant had no intention of manufacturing and delivering to its distributors the new passenger car.

A case somewhat similar on the facts is Tamm v. Ford Motor Co., 8 Cir.,1935, 80 F.2d 723. In that case, Tamm, as trustee in bankruptcy of Herb Ford, Inc., sued the Ford Motor Company for damages, claiming that, in the latter part of July, 1931, the defendant through its branch manager, one Brown, represented to said bankrupt, its dealer or agency, that the defendant would by the 10th day of September, 1931 have in production and deliver to its dealers, including the bankrupt, a new model car, which new car could and would meet competition and find a ready sale; that said representations were made to said bankrupt for the purpose of inducing it, among other things, to continue as a dealer under its dealership contract, and to continue the advertising and sale of defendant's products, and that said bankrupt relied upon said representations, expended a large sum of money by reason thereof in moving its business and equipping new premises and making installations therein; that the defendant failed to have its new car for delivery on September 10, 1931 nor until the month of June, 1932; that the said representations "were false to the knowledge of the said defendant, or were made recklessly, it knowing at the time of the making of said representations that the new model car would not and could not be made ready for delivery within the times represented." The trial court sustained the demurrer to the plaintiff's third amended petition. This action was affirmed by the Court of Appeals, that Court stating, 80 F.2d at pages 729, 730:

"Plaintiff in the petition under inquiry does not aver that the alleged false representations were made with the intention of deceiving bankrupt, or that they were made without any intention of performance. If they were not, then, of course, they fall into the category of mere promises touching future events. Fraudulent misrepresentations ordinarily must be, in order to be actionable, representations as to past or existing facts, and not statements as to what will occur in the future. *We think the whole context of the petition and the whole situation which it attempts to picture indicate quite conclusively that the representations made were not made with any intent to deceive the bankrupt, but that they were made as to a situation which Brown firmly believed would come to pass.* Cases urged upon our attention such as Wendell v. Ozark Orchard Co. (Mo.App.) 200 S.W. 747, loc. cit. 749, and Stonemets v. Head, 248 Mo. 243, 154 S.W. 108, are obviously cases involving not only a prophecy for the future, but statements as to both a past and existing situation known to the speaker from past and present observation and experience. * * * But likewise, obviously, the decisive question in the above cases is not the decisive question here, which, as said already, consists in the failure of the pleader to aver' that Brown made the alleged false representations with the intent to deceive the bankrupt without any intent to perform, and that bankrupt was deceived. Both allegation and proof of this fact are prerequisites to a recovery in a case of fraud and deceit. Nor does the case of Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. [8 Cir.] 64 F.2d 834, herein much relied on, at all aid plaintiff; but as we read it, it reiterates the necessity for the presence of two constituent elements nowhere pleaded in the petition before us, for it says: 'Promises and representations regarding future events, *made with fraudulent intent to deceive, and without any intent to perform,* are actionable.' [Italics ours.)

"*Nowhere in this petition can there be found any allegation that the false representations were made by Brown with the intent to deceive the bankrupt, or that Brown did not intend that his principal, the defendant, should perform.*

"If the petition shall be considered as an action based on a breach of a written contract, of which it bears some earmarks, then plaintiff fares no better. For the contract of which only a fragment is set out in the petition does not, we repeat, bind the defendant to sell any given number of cars, trucks, or parts thereof to the bankrupt, nor does it fix any period whatever to its duration. In these respects it is difficult to distinguish the contract in the case at bar from those held unenforceable in the cases of Ford Motor Co. v. Kirkmyer Motor Co. [4 Cir.] 65 F.2d 1001; Huffman v. [Paige-Detroit] Motor Car Co. [8 Cir.] 262 F. 116; Nebraska Aircraft Corp. v. Varney [8 Cir.] 282 F. 608; Du Pont De Nemours & Co. v. Claiborne-Reno Co. [8 Cir.] 64 F.2d 224, 89 A.L.R. 238; Chevrolet Motor Co. v. McCullough Motor Co. [9 Cir.] 6 F.2d 212; Ford Motor Co. v. Maddox Motor Co., 123 Tex. 608, 73 S.W.2d 517. Indeed a mere glance at the four petitions and the exhibits thereto, which being printed in the record we should be allowed to read, as a basis for the prediction, even off the record, confirms the view, that when all of the facts shall have been developed before a court on a trial on the merits, recovery by plaintiff on the law, and the facts now visible and pleaded is not possible.

"This may under the facts involve a hardship, but the time to guard against such hardships is when men make improvident contracts, and not when such contracts come before the courts. * * *"

In the case before us, there is no allegation in the complaint that the alleged false promise of the delivery of the new passenger car by Mr. Bell was made with intent to deceive the plaintiff, or that Mr. Bell did not intend that his principal, the defendant, should perform. No such statement appears in the affidavit of Mr. Bell; so far as appears from his affidavit, he acted in entire good faith.

The plaintiff relies on the cases of Arnold v. National Aniline & Chemical Co., Inc., 2 Cir.,1927, 20 F.2d 364, 56 A.L.R. 4; Thomas A. Edison, Inc., v. Blackman Distributing Co., Inc., 2 Cir.,1933, 66 F.2d 722; and Holcomb & Hoke Mfg. Co. v. Auto Interurban Co., 140 Wash. 581, 250 P. 34, 51 A.L.R. 39. It seems to us each of these cases can be distinguished on the facts from the case at bar.

It appears to us that the complaint is insufficient because it does not allege that the false representations by Mr. Bell were made with intent to deceive the plaintiff and that the motion to the first cause of action should be sustained.

### The Second Cause of Action

■ The second cause of action is based upon the claim that the defendant wrongfully and in bad faith cancelled the agreement. The allegation in this respect is that the defendant "arbitrarily, wrongfully, without just cause and in bad faith cancelled plaintiff's exclusive distributor sales agreement", to the damage of the plaintiff in the sum of $100,000.

Under the express terms of the agreement it was provided in paragraph 21, above quoted, that "Either party shall have the right to cancel and terminate this agreement at any time upon thirty (30) days written notice to the other party,".

It appears that the defendant cancelled the agreement in accordance with this provision. Such a provision would seem from the cases to be common in agreements between manufacturers and distributors or dealers and have been frequently before the Courts. According to the weight of authority, this provision gave the defendant the unqualified right to cancel and terminate the agreement according to its terms without liability to the plaintiff. Studebaker Corp. v. Wilson, 3 Cir.,1918, 247 F. 403; Huffman v. Paige-Detroit Motor Co., 8 Cir.,1919, 262 F. 116, 118; Chevrolet Motor Co. v. McCullough, 9 Cir.,1925, 6 F.2d 212; Curtiss Candy Co. v. Silberman, 6 Cir.,1930, 45 F.2d 451, 452; Du Pont De Nemours & Co. v. Claiborne-Reno Co., 8 Cir.,1933, 64 F.2d 224, 89 A.L.R. 238; Ford

Motor Co. v. Kirkmyer, 4 Cir.,1933, 65 F.2d 1001, 1003; Motor Car Supply Co. v. General Household Utilities Co., 4 Cir.,1935, 80 F.2d 167; Bushwick-Decatur Motors, Inc., v. Ford Motor Co., 2 Cir.,1940, 116 F.2d 675, 676; Myers Motors, Inc. v. Kaiser-Frazer Sales Co., 8 Cir., 1949, 178 F.2d 291, 303.

Plaintiff relies on the case of Watkins Co. v. Rich, 254 Mich. 82, 235 N.W. 845, but we are of the opinion that that case is not applicable here. It was not followed by Judge Picard in the case of Martin v. Ford Motor Co., D.C.Mich.1950, 93 F.Supp. 920, at page 921, in which he stated:

"The agreement in this case was not for a fixed period but was terminable at any time at defendant's will upon compliance with the requirement as to notice. It is beyond the power of the judiciary to engraft conditions upon the exercise of such a contractual right.

"The court concurs with the holding in Bushwick-Decatur Motors, Inc. v. Ford Motor Co., 2 Cir.,1940, 116 F.2d 675 as properly applying the law of Michigan with respect to the right of termination under a similar agreement, and with the holdings in Buggs v. Ford Motor Co., 7 Cir.,1940, 113 F.2d 618. The Supreme Court of Michigan by its decision in J. R. Watkins Co. v. Rich, 1931, 254 Mich. 82, 235 N.W. 845, did not overrule prior decisions such as Koehler v. Buhl, 1893, 94 Mich. 496, 54 N.W. 157; Garlock v. Motz Tire & Rubber Co., 1916, 192 Mich. 665, 159 N.W. 344; Schmand v. Jandorf, 1913, 175 Mich. 88, 140 N.W. 996; Fuchs v. Standard Thermometer Co., 1913, 178 Mich. 37, 144 N.W. 484. Also McClintock Co. v. Truxall Sales & Service, Inc., 1941, 297 Mich. 284, 297 N.W. 493.

"In the instant case it is clear that Martin's dealership was to continue no longer than either he or the Ford Motor Company desired it to continue and that *its right to terminate it was subject to no conditions as to good or bad faith, motive, intent or results,* except as to the requirement of advance notice if such termination was desired by the Ford Motor Company." (Emphasis added.)

As said in the case of Motor Car Supply Co. v. General Household Utilities Co., 4 Cir., 80 F.2d 167, 171, supra: "Such contracts as those we have here, between manufacturers and distributors of goods, reserving to the manufacturer an arbitrary and unrestricted right of cancellation, are not uncommon. And while, as we said in the Kirkmeyer [Kirkmyer] Case, there is a natural impulse to be impatient with the form of contract which places the comparatively helpless dealer at the mercy of the manufacturer, we do not make the contracts for the parties, and we cannot protect them against lawful agreements and conditions which they may see fit to make for themselves. * * * Our function is to interpret and enforce contracts, not to make or extend them."

We are of the opinion that the motion to the second cause of action is well taken and should be sustained.

An order is drawn accordingly.