Arthur TURKISH, as Co–Trustee of an Express Trust for the Benefit of Ada Turkish Trask; and Ada Turkish Trask, individually as Grantor and Beneficiary of that Trust, and as a member of the Dora and Jacob Cohen Charitable Foundation, Inc., Plaintiffs,

v.

William KASENETZ, Joel Cohen, Alan Cohen, in his individual capacity and as personal representative of the Estate of Samuel Cohen, Daniel Eisenberg, Harry Rebell, Iver Kasenetz, and Gary B. Freidman, Defendants.

Ada Turkish TRASK, as a member of the Dora and Jacob Cohen Charitable Foundation, Inc., Plaintiff,

v.

William KASENETZ, Daniel Eisenberg, Iver Kasenetz, and Gary B. Freidman, Defendants.

Nos. CV 92–4036, CV 92–4037.

United States District Court, E.D. New York.

Sept. 8, 1993.

Fried, Frank, Harris, Shriver & Jacobson (Jed S. Rakoff and Stuart M. Altman, of counsel), New York City, Spizz & Cooper (Harvey W. Spizz, of counsel), Mineola, NY, for plaintiffs.

Greenfield Eisenberg Stein & Seinor (Daniel Eisenberg and Jeffery H. Sheetz, of counsel), Schlam Stone & Dolan (Richard H. Dolan, of counsel), New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiffs Ada Turkish Trask and her son, Arthur Turkish, brought these two cases in the Supreme Court, Nassau County against family members and their associates.

In one case (92 CV 4036) plaintiffs Turkish, as co-trustee of a trust for Trask, and Trask, as grantor and beneficiary of the trust and as a member of the Dora and Jacob Cohen Charitable Foundation, Inc. (the "Foundation"), allege that defendants fraudu-

lently procured a global settlement agreement in 1987 (the "Settlement Agreement"), resolving intra-family state and federal litigation. In the other case (92 CV 4037) Trask alleges, on behalf of and solely for the benefit of the Foundation, that a fraud had been perpetrated on the Foundation. Both cases alleged violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–68, and state law.

These cases were removed to federal district court based on the RICO claims. The first case, 92 CV 4036, was assigned to Judge Denis R. Hurley. The second case, 92 CV 4037, was assigned to these chambers.

By memorandum and order dated April 9, 1993 in 92 CV 4037, *Trask v. Kasenetz*, 818 F.Supp. 39 (E.D.N.Y.1993), familiarity with which is assumed, this court dismissed RICO claims made on behalf of the Foundation, concluding, among other things, that the complaint did not allege that the Foundation had been injured in its "business or property" and that the single alleged act of attempted extortion did not constitute a "pattern." The court remanded the remaining state claims to the state court.

Meanwhile, defendants moved before Judge Hurley to dismiss or alternatively for summary judgment in the first case, 92 CV 4036. That motion remains undecided. Plaintiffs moved to reargue the motion in 92 CV 4037 and to consolidate both cases. This court then caused 92 CV 4036 to be assigned here on consent of Judge Hurley and of all parties.

Plaintiffs now move to amend both complaints, submitting an identical Proposed Second Amended Complaint (the "Amended Complaint") in each action. Because all material issues properly raised in the prior pending motions are subsumed in the motion to amend the complaint in 92 CV 4036, this court discusses solely that motion. Insofar as defendants move for summary judgment in that case, the motion is premature.

## I.

### Allegations of Fact

The proposed amended complaint alleges, in substance, the following.

## A.

### The Parties

The litigants are the children and grandchildren of Jacob Cohen, who died in 1974, and three family associates.

Trask is the daughter of Jacob Cohen and the beneficiary of two trusts. One she created in 1981 (the "Trask Trust"). The other was established by her father in 1961 (the "Cohen–Trask Trust"). The property in this trust has been transferred to the Trask Trust. Trask is also a member and former trustee of the Foundation.

Turkish, Trask's son, is a co-trustee of the Trask Trust.

Defendant William Kasenetz ("Kasenetz") is a son-in-law of Trask's father, Jacob Cohen, of whose estate he is co-executor. Kasenetz is also a trustee of the Cohen–Trask Trust and a member, trustee, and president of the Foundation.

Defendants Joel Cohen and Alan Cohen are the grandsons of Jacob Cohen and the sons of Samuel Cohen, now deceased, of whose estate Joel Cohen is the personal representative.

Defendant Daniel Eisenberg and "nominal defendant" Harry Rebell are not family members. Eisenberg is a co-executor of the estate of Jacob Cohen and a member and trustee of the Foundation. Rebell served as an accountant for many persons and entities referred to in this litigation and was a trustee of the Cohen–Trask Trust until 1988.

Defendants Gary B. Freidman and Iver Kasenetz are not named in the RICO claim but are members and trustees of the Foundation. Freidman is the law partner of Eisenberg. Iver Kasenetz is the son of William Kasenetz.

## B.

### The Alleged Intra–Family Fraud and Extortion

Jacob Cohen, a successful business man, owned in 1961 a 50% interest in some family businesses primarily involved in the owner-

ship and management of real estate in New York and Florida. The other 50% was owned by his sons Samuel and Louis 30% and 20%, respectively. In 1961 Jacob Cohen placed half of his interest into four *inter vivos* trusts, including the Cohen–Trask Trust, for the benefit of his four other children.

At various unspecified times Samuel Cohen wrongfully borrowed substantial sums from the family businesses. In one transaction he used some $8 million to acquire, with Meyer Lansky, an interest in the Flamingo Hotel of Las Vegas, Nevada. In 1971 he pleaded guilty to conspiring with Lansky to skim $36 million from that hotel to avoid the payment of income taxes.

Samuel Cohen's sons, Joel and Alan, were also involved in financial transactions linked to members of organized crime. They borrowed money from the family businesses to invest in various entities, including the Cricket Club of Miami and the Comal Corp.

This lawsuit and plaintiffs' prior lawsuits, traced to their source, spring from these loans.

### 1. The alleged Jacob Cohen estate fraud

After Jacob Cohen died in 1974, his estate sold his interest in the family businesses to Alan Cohen, Joel Cohen, and Kasenetz. To induce Trask to agree to the sale, the three buyers fraudulently concealed, among other things, amounts they and Samuel Cohen owed to the family businesses.

In 1979 Trask commenced an action in Nassau County court to compel an accounting of the Cohen–Trask Trust. In 1981 she brought a federal RICO action before Judge Constantino in this district, alleging that Kasenetz, Samuel Cohen, Alan Cohen, Joel Cohen, and Eisenberg had failed to make material disclosures in connection with the sale of the interest in family businesses owned by the estate of Jacob Cohen. Defendants allegedly sent materials by mail as late as 1983 in an effort to conceal this fraud.

### 2. The alleged Settlement Agreement fraud

In 1987, some two years after Samuel Cohen died, the parties to the state and federal actions entered into the Settlement Agreement, resolving all pending claims. In that agreement, Joel Cohen, Alan Cohen, the estate of Samuel Cohen, and Kasenetz represented, based on the advice of accountants, that all loans made by entities in which Trask's trusts had any interest had been fully repaid with 6% simple interest.

The agreement provided that, "In the event that the foregoing representations are inaccurate to any extent, then the sole remedy of the Releasors shall be to require William Kasenetz, Alan Cohen, Joel Cohen or the Estate of Samuel Cohen, respectively, to make payment in full of the balance of any such unpaid loans to the extent of their several obligations, together with interest at the rate of six (6%) percent simple interest."

The agreement also provided that the estate of Samuel Cohen would pay $1,163,529 to Trask or the Trask Trust; Kasenetz would pay $36,471 to Trask and $520,000 to Spizz & Cooper, her counsel; and Trask and Turkish would release defendants in the actions from legal claims. The parties apparently performed on each of these promises.

At various times between 1988 and 1992, defendants assured Trask, Turkish, and plaintiffs' counsel that the loans and interest had been fully repaid and discouraged plaintiffs from conducting an independent review of the financial records of the family businesses.

At some point, the complaint does not say precisely when, plaintiffs' accountants examined these records and discovered a "substantial underpayment" of loan principal and interest.

### 3. The alleged release-for-grant scheme

Seemingly at the same time that Trask and Turkish discovered the alleged underpayment, Eisenberg offered a deal to Trask and Turkish which has been described in this court's previous opinion. 818 F.Supp. at 41–42.

In summary, he proposed that the Foundation make a donation of all assets to an orthodox synagogue in Florida that Trask and Turkish were eager to support. In return Trask and Turkish would release the

defendants in this action and others from all legal claims. Trask feared that, if she refused the offer, she would not be re-elected as Foundation trustee or timely receive distributions from the Cohen–Trask Trust and the estate of Jacob Cohen.

Several months after Turkish and Trask refused the offer, the Foundation's members held an annual meeting and, for the first time in many years, failed to re-elect Trask as trustee, thereby depriving the Foundation, its beneficiaries, and presumably its members of her services.

Kasenetz and Eisenberg, as co-executors of the estate of Jacob Cohen, failed to distribute more than $500,000 in estate assets to Trask until after this action was brought. Approximately $1.3 million in liquid assets remaining in the Cohen–Trask Trust have not been distributed to Trask.

### 4. *The alleged tax fraud*

The complaint alleges on information and belief that defendants used the mails to file fraudulent tax returns with the Internal Revenue Service and the State of New York, on behalf of themselves and entities in which the Cohen–Trask Trust had an interest.

### II.

### *The RICO Claims*

Defendants contend, in substance, that the motion to amend the complaint's allegations of RICO predicate acts and injuries is futile because the proposed complaint could not withstand a motion to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The court tests the RICO claims in the proposed complaint by the standards imposed by those rules.

To state a claim under the RICO Act, a plaintiff must allege that each defendant violated 18 U.S.C. § 1962 and that plaintiff was injured in its "business or property" by reason of that violation. 18 U.S.C. § 1964(c).

### A.

### *Whether defendants violated section 1962*

The proposed complaint alleges that defendants violated sections 1962(c) and (d) of the RICO Act.

To establish a violation of section 1962(c), a plaintiff must allege seven constituent elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). To establish a violation of section 1962(d), a plaintiff must allege that the defendant conspired to violate section 1962(a), (b), or (c).

### 1. *The predicate acts of racketeering*

The complaint alleges that the defendants engaged in eight racketeering schemes which, for simplicity, this court discusses as four schemes, namely, (1) the sale to Alan and Joel Cohen and Kasenetz of an interest in family businesses by the estate of Jacob Cohen in 1975; (2) the scheme to induce the Settlement Agreement by falsely misrepresenting that loans had been repaid with interest and, later, to conceal the underpayment of the loans and interest; (3) the proposed release-for-grant scheme; and (4) the tax fraud.

In the course of these schemes, each RICO defendant allegedly committed or conspired to commit at least two or more acts of mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; or extortion, 18 U.S.C. § 1951. These violations each constitute "racketeering activity," within the meaning of 18 U.S.C. § 1961(1).

### a. *The sale of an interest in family businesses*

Plaintiffs allege a fraudulent scheme in 1975 to sell an interest in family businesses at a reduced price, causing injury to plaintiffs, in order to show that defendants have engaged in a continuous and related pattern of racketeering activity. Plaintiffs do not seek damages based on the 1975 scheme.

Defendants contend that plaintiffs are precluded by the doctrine of *res judicata* from

relitigating this claim because it was resolved by the Settlement Agreement executed in 1987 and dismissed by this court with prejudice. While plaintiffs do not dispute that the claim relating to the 1975 sale was the subject of prior federal litigation and was dismissed with prejudice by Judge Constantino, plaintiffs contend that "a release does not bar relitigation if it is procured through fraud."

The dismissal of an action with prejudice "has the effect of a final adjudication on the merits favorable to the defendant and bars future suits brought by plaintiff upon the same cause of action." *Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir.1986).

Rule 60(b) of the Federal Rules of Civil Procedure, which "strikes a balance between serving the ends of justice and preserving the finality of judgments," *id.* at 61, sets forth grounds, such as fraud, upon which a final judgment and order may be rescinded. But if plaintiffs successfully invoke Rule 60(b), they presumably would have to tender back the proceeds of the Settlement Agreement. *See Cresswell v. Sullivan & Cromwell*, 668 F.Supp. 166, 171 (S.D.N.Y.1987). Plaintiffs make no motion under Rule 60(b)(3) to set aside this court's final judgment, probably because such a motion must be made within one year.

Plaintiffs cite *Cresswell* for the proposition that a final judgment entered pursuant to a settlement agreement obtained by fraud does not bar plaintiffs from relitigation claims that have been dismissed with prejudice. *Cresswell* holds, more narrowly, that when a plaintiff is fraudulently induced to settle a claim and dismiss an action with prejudice, the defrauded party can elect between rescission under Rule 60(b) on the one hand and ratification and suit for damages on the other hand. *Id.* at 170–171. *See also Slotkin v. Citizens Cas. Co.*, 614 F.2d 301, 312 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980).

■ Insofar as defrauded parties, such as plaintiffs here, elect to ratify an agreement and sue for additional injuries, their cause of action arises from the fraud in the inducement of the settlement. Plaintiffs cite no cases, and this court finds none, holding that a RICO plaintiff may ratify a settlement agreement obtained by fraud, yet relitigate the underlying claims as though a settlement agreement had never been reached. Because these plaintiffs' have not sought to rescind the settlement agreement, their claim for additional damages must be based solely on the additional injury caused by the allegedly fraudulent misrepresentations contained in the Settlement Agreement.

*Spiegel v. Continental Illinois Nat'l Bank*, 790 F.2d 638, 646 (7th Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986), cited by plaintiffs, does not support them. There, plaintiff brought a RICO action which was dismissed because it failed to allege a pattern. He subsequently brought a second action alleging the same predicate acts of mail fraud, plus two additional predicate acts. The District Court held, and the Circuit Court affirmed, that all acts alleged in the second action that had been dismissed in the previous action, were barred by the doctrine of *res judicata*. *Id.* at 643, 646. The District Court addressed solely whether the newly alleged predicate acts constituted mail fraud.

Applying *Cresswell* and *Spiegel* to this case, the court holds that these plaintiffs may not relitigate claims of racketeering activity by defendants previously alleged in the action dismissed with prejudice by this court.

b. *The alleged fraudulent inducement of the Settlement Agreement and the concealment of that fraud*

■ Plaintiffs contend that they were fraudulently induced in 1987 to enter into the Settlement Agreement by false representations regarding whether the loans and interest had been repaid, and that defendants later attempted to conceal the underpayment of loans and interest.

The complaint is bare of specific allegations to support a strong inference that defendants intended to mislead plaintiffs to believe that the contested loans had been repaid with interest. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 79–80 (2d Cir. 1990) ("Allegations of scienter are [only] suf-

ficient if supported by facts giving rise to a 'strong inference' of fraudulent intent.").

The proposed complaint alleges only that (1), on information and belief, Alan Cohen, Joel Cohen, and Kasenetz acted fraudulently in representing that the loans had been repaid with interest; (2) plaintiffs' accountants later examined records pertaining to these loan and interest repayments and found a "substantial underpayment;" and (3) at least five letters, the contents of which are not described in the complaint, were mailed between July 1989 and June 1992 with an intent to conceal the alleged fraud.

The court is left to guess at the scale of this alleged underpayment, whether alleged misrepresentations contained in the Settlement Agreement were material, and why plaintiffs infer that defendants acted with scienter. The complaint does not allege, for example, that plaintiffs were fraudulently induced justifiably to conclude that they had viewed all relevant records.

Moreover, the court places little weight on plaintiffs' insubstantial contention that they were hampered in their efforts to review the relevant financial records. The papers make clear that plaintiffs had a legal right to examine such records, that they were ably represented by counsel, and that they were not reluctant to seek that to which they were entitled. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991) (holding that a district court may consider matters of which judicial notice may be taken under Fed.R.Evid. 201 and may consider sections of a document from which the complaint quoted selectively).

Plaintiffs conclusory allegations of fraud raise no inference that plaintiffs acted with scienter. Thus, the allegations fail to meet the requirements of Rule 9(b).

■ But even if the proposed second amended complaint could be again amended to include allegations raising a strong inference that defendants intended to and did mislead plaintiffs to believe that the contested loans had been repaid with interest, the complaint would still fail.

Paragraph 12(E) of the Settlement Agreement provides that if defendants' representa-

tions "are inaccurate to any extent," then the "sole remedy" shall be to require Kasenetz, Alan Cohen, Joel Cohen, or the estate of Samuel Cohen to repay the loans with interest. As added protection to Trask, Trask was granted the right, in paragraph 12(F), to examine financial records pertaining to this indebtedness.

She has now done this. In her reply brief she says her accountants discovered underpayments of several million dollars to entities in which the Cohen–Trask Trust apparently had a small interest. Trask and her attorney evidently wish to keep the $1.72 million they received in 1988 to settle this matter. Yet, they seek to pursue a claim under the RICO Act for damages as an alternative to the remedy provided for in the Settlement Agreement.

Plaintiffs cite to, and this court finds, no authority allowing such an extraordinary result. In *Slotkin* and *Cresswell,* the Second Circuit and a Southern District of New York court observed that a plaintiff could bring a second action for damages without rescinding a settlement agreement induced by fraud. But the settlement agreement in those cases provided no remedy in the event that a specific representation was wrong, and those cases did not address whether a subsequent action for damages could be limited by an agreement's remedy provision.

Here, by contrast, the parties focused on the remedy to be provided in the event that Kasenetz, Alan Cohen, Joel Cohen, or the estate of Samuel Cohen had misrepresented that all loans and interest were repaid. Moreover, the parties provided Trask and Turkish a mechanism by which to determine whether the loans and interest had been paid. Now that the very event contemplated has allegedly occurred, one side urges the court to ignore the agreed upon remedy.

Plaintiffs' reliance on *Bridger v. Goldsmith,* 143 N.Y. 424, 38 N.E. 458 (1894), is misplaced. That court addressed solely whether a contracting party could secure complete immunity from liability based on a clause in a contract that was itself procured by fraud. There is no question here as to whether defendants are liable for misrepre-

sentations in the contract. The question is solely whether the remedy provided in the contract, in the event that representations about loans and interest are untruthful, should limit plaintiffs' recovery.

In summary, plaintiffs settled a long-standing family feud in 1987 for $1.72 million. The Settlement Agreement provided that certain obligations had been repaid, that plaintiffs had the legal right and means to confirm those repayments, and that, if the obligations had not been repaid in full, plaintiffs had the right to demand and, if necessary, to sue for further specific damages.

Under the facts of this case, plaintiffs' second action for damages due to misrepresentations in the Settlement Agreement regarding the loans and interest is limited by the remedy provided in that agreement in the event the representations about the loans and interest are not correct.

c. *The release-for-grant scheme*

■■ This court previously concluded that the complaint could be amended to allege that, in proposing the release-for-grant deal, defendants deliberately sought to obtain property by putting Trask in reasonable fear of economic loss, in violation of the Hobbs Act, 18 U.S.C. § 1951(b)(2).

The proposed complaint alleges that plaintiffs feared that, if they failed to agree to execute the releases, defendants might fail to distribute estate and trust assets to Trask and her trusts.

While plaintiffs have alleged little to suggest that defendants would reasonably believe that plaintiffs are as fearful as the complaint asserts, allegations of extortion need not be pleaded with particularity, and the court will not decide a question of fact when addressing the adequacy of a proposed pleading. Thus, the proposed amended complaint adequately alleges an attempt to extort.

■ The court rejects plaintiffs' contention, in reargument, that the Hobbs Act protects persons placed in fear solely of non-economic loss. They cite no authority, and the court finds none.

■ The court also rejects plaintiffs' contention, in reargument, that the proposed complaint adequately alleges a mail and wire fraud arising from the release-for-grant scheme. The proposed complaint, like the prior complaint, fails to allege that defendants engaged in any deception in connection with this scheme. Plaintiffs speculate that defendants would have concealed self-dealing by Foundation trustees from the Foundation, its beneficiaries, and those charged with policing self-dealing by Foundation trustees.

Plaintiffs cite no authority in reargument suggesting that these defendants could be indicted under the mail fraud statute because, had their release-for-grant scheme succeeded, they would have concealed the scheme from the New York Attorney General, the Internal Revenue Service, and others. Under plaintiffs' expansive theory of the criminal law, a defendant who attempts to embezzle may also be indicted for mail fraud and, presumably, tax fraud because the defendant is unlikely to declare ill-gotten gains on a future tax return. The court finds no authority holding that the criminal law and its civil step-child, the RICO Act, are so elastic.

d. *The alleged tax fraud*

■ The proposed complaint alleges, on information and belief, that defendants knowingly failed to report income on their personal income tax returns and the tax returns of entities in which the Cohen–Trask Trust held an interest, in violation of the mail fraud statute.

Plaintiffs appear to make this inference in three steps. First, after learning from their accountant that defendants had forgiven certain loans and waived interest, they conclude that defendants should have declared forgiven indebtedness income or imputed income on their personal tax returns and on the tax returns of certain unnamed entities in which the Cohen–Trask Trust once had an interest. Second, they speculate that defendants did not declare such income on these returns. Third, they speculate, primarily because defendants have utilized the services of competent tax counsel, that defendants must have known that such tax returns, presumed to be

sent by mail, were false. Plaintiffs contend that, with discovery, they can prove these allegations.

Rule 9(b) of the Federal Rules of Civil Procedure is designed to protect defendants from allegations of fraud based on such speculations. Plaintiffs' conclusory contention that defendants had the motive and opportunity to conceal income on their tax returns is unpersuasive. Such a contention can be plausibly raised about many a taxpayer.

Plaintiffs allege no facts giving rise to a strong inference that defendants knowingly on recklessly used the mails to send false tax returns.

2. *Whether the adequately alleged acts of racketeering activity constitute a "pattern"*

The proposed amended complaint, like the earlier complaint already dismissed by this court, alleges a single act of attempted extortion. To establish a "pattern of racketeering activity," a complaint must allege at least two such acts, 18 U.S.C. § 1961(5), and those acts must be "continuous" and "related." Thus, the proposed complaint fails to allege that defendants violated section 1962.

### B.

*Whether the Foundation was injured in its "business or property" by reason of a violation of section 1962*

In its previous opinion, this court concluded that, because the complaint alleged solely a breach of fiduciary duty by Foundation directors, the complaint failed to allege a cognizable RICO injury. 818 F.Supp. at 44.

Plaintiffs contend, in reargument, that the Foundation and its beneficiaries have been injured due to a wrongful denial of economic information and honest administration. The proposed complaint does not explain whether this injury arises from the failure of Foundation members to re-elect Trask as trustee or from the dishonest use of the Foundation by defendants for their personal advantage. Presumably the alleged denial of information and honest services arises from either or both of these acts.

Whether a charitable organization has standing to bring a RICO action against its unpaid trustees who use the organization for personal advantage appears to be a question of first impression. The court therefore explains its reasoning in some detail.

Section 1964(c) provides a civil remedy only to "[a]ny person injured in his business or property by reason of a violation of section 1962." In *West Hartford v. Operation Rescue*, 915 F.2d 92, 103–04 (2d Cir.1990), *cert. denied*, —— U.S. ——, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992), the Second Circuit reasoned, based on the legislative history of the RICO Act and cases interpreting the analogous Clayton Act, 15 U.S.C. §§ 15 *et seq.*, that the words "business or property" refer only to "commercial interests and enterprises."

That court held that the plaintiff, a municipal corporation, did not have standing to allege injury to its ability "to carry out its functions," even though it could show that defendant had imposed costs of $42,000 in police overtime wages. The court suggested that the municipality could only recover under the RICO Act for injuries suffered " 'in its capacity as a consumer of goods and services' " or " 'as a party to commercial transactions.' " *Id.* at 103 (citations omitted).

The proposed complaint here alleges no discernible economic injury to the Foundation, whether as a consumer of services or a party to a commercial transaction. It does not say that the Foundation made grants after the time defendants allegedly used it to extort releases or failed to re-elect Trask, that it paid salaries to allegedly dishonest trustees, or that it disseminated "economic information" that might place anyone's investments at risk. Any economic injuries to the Foundation due to taxes that one day could be imposed, or to prospective beneficiaries that do not receive grants, are entirely speculative.

The only alleged injury to this non-commercial corporation is that its governing body has been injured and, thus, the Foundation, like the Town of West Hartford, has been injured in its ability to carry out its function. Injuries of this sort to a non-

**574**

commercial enterprise do not fall within the scope of section 1964(c).

As the Second Circuit reiterated in *West Hartford*, " 'the purpose of civil RICO liability does not extend to deterring any illegal act ... for which there are state and common law remedies.' " *Id.* at 104 (ellipsis in original). New York State provides a remedy to the members of a not-for-profit corporation and to the New York Attorney General when a not-for-profit corporation's directors and officers engage in the kinds of acts alleged here. *See* N.Y. Not-for-Profit Corp. Law §§ 706(d), 714(c), and 1102(a)(2)(D). Indeed, plaintiffs relied on this statute when obtaining injunctive relief from the state court. This court sees no reason why the state law remedy, narrowly crafted to cure the very wrongful conduct alleged here, is inadequate.

Plaintiffs cite *United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991) for the proposition that the Foundation and its prospective beneficiaries have a property interest in the proper management of the Foundation. That case has no application here. It held merely that shareholders of a for-profit corporation have a "property interest," within the meaning of the mail fraud statute, in economic information relating to a corporation and that the directors and officers who act dishonestly can be indicted under that statute.

That case does not construe "property" in section 1964(c). More fundamentally, even if "property" is construed identically in section 1964(c) and the mail fraud statute, *Wallach* does not suggest that the RICO Act protects non-commercial enterprises, such as a charitable foundation, from the dishonest administration of its unpaid trustees where no discernible economic harm results. That court explained that when dishonest corporate directors deny shareholders of accurate information regarding how corporate assets are spent, the shareholder's investments are placed at risk. Plaintiffs allege no similar harm.

Thus, the proposed amended complaint alleges no injury to the Foundation cognizable under the RICO Act.

## III.

### Conclusion

Defendants' motion to dismiss RICO claims in 92 CV 4036 is granted, and plaintiffs' motion for leave to file a second amended complaint in that action is denied. The court declines to exercise supplemental jurisdiction over the remaining state claims in that case, having dismissed all claims over which this court has original jurisdiction. 28 U.S.C. § 1367(c)(3). That case is remanded to the state court.

Plaintiffs' motion to reargue and for leave to file an amended complaint in 92 CV 4037 is denied. The court affirms its previous opinion remanding that case to the state court.

Both cases are dismissed.

So ordered.