Arthur TURKISH, as Co–Trustee of an Express Trust for the Benefit of Ada Turkish Trask; and Ada Turkish Trask, individually as Grantor and Beneficiary of that Trust, and as a member of the Dora and Jacob Cohen Charitable Foundation, Inc., Plaintiffs–Appellants,

v.

William KASENETZ, Joel Cohen, Alan Cohen, in his individual capacity and as personal representative of the Estate of Samuel Cohen, Daniel Eisenberg, Harry Rebell, Iver Kasenetz and Gary B. Freidman, Defendants–Appellees.

Nos. 1341, 1529, Dockets 93–9084, 93–9120.

United States Court of Appeals,
Second Circuit.

Argued March 25, 1994.

Decided June 2, 1994.

tion to dismiss plaintiffs' RICO claims in *Turkish,* and remanded the remaining state claims in *Turkish* to state court. The court held that of the eight racketeering acts alleged in the second amended complaint, only one constituted a predicate RICO act. As we believe that the complaint alleged at least two predicate acts, we reverse and remand.

Mitchell M. Gans, Mineola, NY (Spizz & Cooper, Mineola, NY, Harvey W. Spizz; Fried, Frank, Harris, Shriver & Jacobson, New York City, Jed S. Rakoff, Howard W. Goldstein, Stuart M. Altman, of counsel), for plaintiffs-appellants.

Richard H. Dolan, New York City (Schlam Stone & Dolan; Greenfield Eisenberg Stein & Senior, Daniel Eisenberg, Jeffrey H. Sheetz, of counsel), for defendants-appellees except Harry Rebell.

Before: LUMBARD, OAKES, and ALTIMARI, Circuit Judges.

LUMBARD, *Circuit Judge:*

Plaintiffs Ada Turkish Trask and Arthur Turkish appeal from a judgment of the District Court for the Eastern District, Nickerson, *Judge,* remanding two related actions to the New York Supreme Court. In *Trask v. Kasenetz,* Trask brought claims against William Kasenetz, Daniel Eisenberg, Iver Kasenetz, and Gary B. Freidman under New York law and the Racketeer Influenced and Corrupt Organizations Act (RICO). In *Turkish v. Kasenetz,* Turkish and Trask brought RICO and state law claims against William Kasenetz, Joel Cohen, Alan Cohen and Harry Rebell. On April 9, 1993, 818 F.Supp. 39, the district court dismissed the RICO claims in *Trask,* and remanded the state claims to state court. Plaintiffs moved to reargue and for leave to file a second amended complaint consolidating the two actions, and defendants moved to dismiss *Turkish.* In a memorandum and order dated September 8, 1993, 832 F.Supp. 565, the court denied plaintiffs' motion to reargue *Trask,* affirmed its opinion of April 9, denied plaintiffs' motion for leave to file a second amended complaint, granted defendants' mo-

## I.

In the 1920s, Jacob Cohen and two of his six children, Samuel Cohen and Louis Cohen, started a "family business," which was composed of various corporations and partnerships primarily involved in real estate ventures in New York and Florida. Until 1961, Jacob Cohen held a fifty percent interest in the family business, Samuel Cohen a thirty percent interest, and Louis Cohen a twenty percent interest.

In 1961, Jacob Cohen created a series of *inter vivos* trusts (the "Cohen trusts") for his four children who were not involved in the family business: Ada Turkish Trask, Abraham Cohen, Sophie Resnick, and Rose Kasenetz. Jacob gave to the four Cohen trusts half of his interest in the family business (twenty-five percent of the total). Samuel Cohen, Louis Cohen, William Kasenetz (Jacob Cohen's son-in-law) and Harry Rebell (Jacob Cohen's accountant) were named co-trustees of the four Cohen trusts. Upon Louis Cohen's death in 1976, Trask replaced him as trustee. In 1981, Trask assigned her right to one of the four Cohen trusts (the "Cohen–Trask trust") into a trust (the "Trask trust") with herself as sole beneficiary and her son, Arthur Turkish, as trustee.

During the 1960s and 1970s, Samuel Cohen allegedly borrowed millions of dollars from the family business and the trusts in breach of his fiduciary duty. He spent much of the money in financial transactions linked to members of organized crime.

Jacob Cohen died in 1974. In 1975, his estate sold his remaining twenty-five percent interest in the family business to Kasenetz and to Alan and Joel Cohen, Samuel Cohen's sons. The three buyers allegedly made fraudulent representations and concealed

material facts in order to induce the estate to agree to the sale.

Shortly after Jacob Cohen's death, Louis Cohen sold his twenty percent interest to Samuel Cohen and to Kasenetz. After these transactions, the ownership of the family business was divided as follows: Samuel, Alan, and Joel Cohen held a combined fifty-two and one-half percent interest; the Cohen trusts held a combined twenty-five percent interest; and Kasenetz held a twenty-two and one-half percent interest.

Samuel Cohen died in 1985, and his interest in the family business passed to Joel and Alan Cohen. Since Samuel's death, Joel and Alan have held a combined fifty-two and one-half percent interest, the Cohen trusts have held a combined twenty-five percent interest, and Kasenetz has held a twenty-two and one-half percent interest.

Turkish, Trask and several of the defendants have been involved in repeated litigation stemming from the 1975 sale of Jacob Cohen's interest and from Samuel Cohen's loans. We discuss only those lawsuits relevant to this appeal. In 1979, Trask, as co-trustee and beneficiary of the Cohen trusts, commenced an action in Nassau County Supreme Court against Kasenetz, Rebell (the accountant), Samuel Cohen, and Edward and Martin Cohen as executors of Louis Cohen's estate. Trask sought an accounting of the Cohen trusts, in part due to Samuel Cohen's allegedly improper loans.

In 1981, Trask, as executrix of Jacob Cohen's estate, brought an action in the Eastern District of New York against Kasenetz, Samuel Cohen, Joel Cohen, Alan Cohen, and Daniel Eisenberg (an attorney for various defendants and co-executor of Jacob Cohen's estate). The complaint alleged that the defendants failed to make material disclosures in connection with the 1975 sale by Jacob Cohen's estate of a twenty-five percent interest in the family business.

In December 1987, while these actions were pending, the parties to these actions signed a Stipulation of Settlement (the "Settlement Agreement"). Plaintiffs agreed to dismiss with prejudice all outstanding claims. Defendants agreed to pay about $1.7 million to plaintiffs and their attorneys. Paragraphs 7(C) and 12 of the Settlement Agreement are particularly relevant to the current litigation. Paragraph 7(C) stipulates that the parties:

> have had full and complete access to all books, documents, records, litigation files and other sources of information affecting all litigations....

Paragraph 12 discussed the improper loans taken from the family business. In sections 12(A)–(D), Alan Cohen, Joel Cohen, Kasenetz, and the Estate of Samuel Cohen represented that the disputed loans had been repaid with interest, and that they owed no money to the family business. Sections 12(E)–(F) provided:

> E. The parties to this Stipulation recognize and understand that the foregoing representations in this paragraph 12 have been made by William Kasenetz, Alan Cohen, Joel Cohen and the Estate of Samuel Cohen to the Releasors based on the advice of accountants retained to examine the books and records of said entities. In the event that the foregoing representations are inaccurate to any extent, then the sole remedy of the Releasors shall be to require William Kasenetz, Alan Cohen, Joel Cohen or the Estate of Samuel Cohen, respectively, to make payment in full of the balance of any such unpaid loans to the extent of their several obligations, together with interest at the rate of six (6%) percent simple interest.
>
> F. The Releasors shall have the right to examine all books and records pertaining to such indebtedness.

About the fall of 1989, plaintiffs became suspicious that the loans had not been repaid. Morris Radmin, plaintiffs' accountant, examined the records of the family business, and allegedly discovered an underpayment of principal and interest.

In 1991, after Radmin discovered the underpayment, Eisenberg allegedly offered a settlement to Trask and Turkish concerning the Dora and Jacob Cohen Charitable Foundation, Inc. (the "Foundation"). The Foundation is a not-for-profit New York corporation founded by Jacob Cohen to benefit Jewish-affiliated charities located near Miami Beach, Florida. Until November 1989,

Trask, Kasenetz, and Eisenberg were the sole members, trustees and officers of the Foundation. In November 1989, Gary B. Freidman (an accountant for Kasenetz) and Kasenetz's son Iver were elected as additional members.

Trask had proposed that the Foundation donate all of its funds to an orthodox synagogue near Miami Beach. Eisenberg and Kasenetz apparently opposed the donation. However, in 1991, Eisenberg allegedly proposed a plan whereby he and Kasenetz would support the donation if plaintiffs signed general releases in favor of defendants. Eisenberg threatened that if plaintiffs failed to sign the releases, he and Kasenetz would withhold approval for the donation, and plaintiffs would suffer "hostilities." Plaintiffs apparently did not fear physical harm, but feared that defendants would withhold monies due to Trask from the Cohen trusts and from Jacob Cohen's estate, unless plaintiffs signed the releases. Nonetheless, plaintiffs refused to execute the releases. Thereafter, the donation to the synagogue was not approved, and Trask was not re-elected a trustee, a position she had held for 25 years.

On July 29, 1992, plaintiffs commenced two actions in Nassau County Supreme Court. In *Trask v. Kasenetz,* Trask (on behalf of the Foundation) brought state law and RICO claims against William Kasenetz, Eisenberg, Iver Kasenetz, and Freidman. In *Turkish v. Kasenetz,* Turkish (as trustee for the Trask trust) and Trask brought state law and RICO claims against Kasenetz, Joel Cohen, Alan Cohen (in his individual capacity and as representative of the Estate of Samuel Cohen), and Harry Rebell.

Defendants removed both actions to the District Court for the Eastern District. *Trask* was assigned to Judge Nickerson and *Turkish* was assigned to Judge Hurley. In a memorandum and order dated April 9, 1993, *Trask v. Kasenetz,* 818 F.Supp. 39 (E.D.N.Y. 1993), Judge Nickerson dismissed *Trask,* concluding, *inter alia,* that the complaint did not allege that the Foundation had been injured in its "business or property," and that the single alleged act of extortion did not constitute a pattern as required to state a claim under RICO. The court remanded the state claims to state court. Plaintiffs moved for re-argument on May 17, 1993.

On October 5, 1992, defendants moved for dismissal or summary judgment in *Turkish.* On June 7, 1993, while that motion and the motion for reargument in *Trask* were pending, the court transferred *Turkish* from Judge Hurley to Judge Nickerson. On June 10, 1993, plaintiffs moved for leave to file a second amended complaint consolidating the two actions. The complaint alleged five causes of action: RICO, RICO conspiracy, common law fraud, breach of fiduciary duty, and breach of contract.

The RICO and RICO conspiracy counts were based on eight predicate racketeering acts. For acts one through three, the complaint alleged that defendants made fraudulent omissions, had undisclosed conflicts of interest, and made affirmative misrepresentations in relation to the 1975 sale by Jacob Cohen's estate of its twenty-five percent interest in the family business. For acts four and five (the "Settlement Fraud" scheme), the complaint alleged that defendants fraudulently induced plaintiffs to sign the 1987 Settlement Agreement, and subsequently concealed that fraud. For acts six and seven, the complaint alleged extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, wire fraud in violation of 18 U.S.C. § 1343, and mail fraud in violation of 18 U.S.C. § 1341, all in connection with defendants' attempt to obtain general releases from plaintiffs in exchange for approval for the synagogue donation. Finally, for act eight, the complaint alleged that defendants committed tax fraud when they failed to report as income the funds diverted from the family business.

In a memorandum and order dated September 8, 1993, *Turkish v. Kasenetz,* 832 F.Supp. 565 (E.D.N.Y.1993), the court found that as a matter of law the second amended complaint failed to state a cause of action under RICO, as the complaint adequately alleged only one predicate act—extortion in violation of the Hobbs Act—and thus failed to allege a pattern of two or more racketeering acts. The court denied plaintiffs' motion for leave to file the second amended complaint, and dismissed the RICO claims in *Turkish.* Having dismissed all claims over

which it had original jurisdiction, the court remanded the remaining state claims to state court. As for *Trask,* the court denied plaintiffs' motion to reargue and for leave to file an amended complaint, and affirmed its previous opinion remanding that case to state court.

Plaintiffs appeal, arguing that the second amended complaint adequately alleged two or more acts constituting a pattern of racketeering activity, and therefore stated a cause of action under RICO.

## II.

At issue is whether the complaint alleged a violation of the substantive RICO statute, 18 U.S.C. § 1962 (1988), by setting out two or more predicate acts. We find that it did.

■ For a first predicate act, as the district court found—and defendants do not contest on appeal—the complaint alleged that defendants violated the Hobbs Act, 18 U.S.C. § 1951(b)(2) (1988). The complaint alleged that plaintiffs feared that if they failed to execute the releases, defendants would withhold from Trask assets due to her from Jacob Cohen's estate and the Cohen trusts. The complaint therefore alleged that defendants deliberately sought to obtain property by putting Trask in reasonable fear of economic loss, in violation of the Hobbs Act. *See United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987).

■ For a second predicate act, the complaint alleged that defendants committed a "settlement fraud" by falsely representing in paragraph 12 of the Settlement Agreement that they had repaid all loans, and that their accountants had determined this to be true by examining the business's books and records. According to the complaint, defendants made those representations knowing that their accountants had not examined the books and records, and knowing that the loans had not been repaid. Because the complaint alleges that the fraud was perpetrated with the use of interstate mails and wire communications, the alleged settlement

fraud violates the wire fraud statute, 18 U.S.C. § 1343 (Supp. IV 1992), and the mail fraud statute, 18 U.S.C. § 1341 (Supp. IV 1992), and is a predicate RICO act. *See* 18 U.S.C. § 1961(1)(B) (1988).

The district court held that the alleged settlement fraud did not constitute a predicate RICO act on two grounds. First, paragraph 12(E) of the Settlement Agreement provided that in the event that the foregoing representations were inaccurate, plaintiffs' "sole remedy" would be to recover principal plus six percent interest. The court found that this limitation of liability clause precluded plaintiffs from seeking the alternative remedy of RICO damages. Second, the court found that the amended complaint did not plead scienter with adequate specificity.[1] Defendants adopt these two arguments on appeal, and also argue that use of the settlement fraud as a predicate act is barred by the statute of limitations. We disagree on all three grounds.

*Effect of Paragraph 12(E)*

Paragraph 12(E) does not bar plaintiffs from asserting the settlement fraud as a predicate act. Paragraph 12(E) provides plaintiffs with a sole remedy "[i]n the event that the foregoing representations are inaccurate." The "foregoing representations" are those made in paragraphs 12(A)–(D)— i.e., that the loans were fully repaid and that defendants owed no monies to the family business. Here, plaintiffs do not merely claim that there were "inaccuracies" in those representations. Rather, the complaint alleges that the defendants fraudulently induced plaintiffs to enter the Settlement Agreement by falsely representing that their accountants had examined the books and records of the family business and had determined that the loans had been repaid. Plaintiffs are not seeking an alternative remedy for the inaccuracies for which paragraph 12(E) provides a remedy.

■ We could not uphold any provision intended to insulate parties from their own fraud. It is well settled that parties cannot

---

1. The district court did not allow plaintiffs to amend the complaint to correct this defect because the court found that paragraph 12(E) would have precluded the action even if the defect were corrected.

use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct. *See Arnold v. National Aniline & Chem. Co.*, 20 F.2d 364 (2d Cir.1927). Defendants are attempting to do just that.

Defendants argue that this doctrine applies only to clauses that completely exempt a party from liability, not to those that limit liability. We are not persuaded. Defendants do not cite a single case that supports their argument. Moreover, the rationale behind the doctrine—to prevent parties from shielding themselves from liability for their own fraud by inserting a clause into the very contract that was procured by the fraud— applies equally to the limitation of liability and to the exclusion of liability. *See, e.g., Bates v. Southgate*, 308 Mass. 170, 171, 31 N.E.2d 551, 555 (1941) ("Attempts under the form of contract to secure total or partial immunity from liability for fraud are all under the ban of the law.") (citation omitted).

■ Defendants also argue that paragraph 7(C) bars plaintiffs from avoiding the limitation of liability provision in paragraph 12(E). In paragraph 7(C), the parties stipulated that they had full access to the books and records of the family business. Defendants submit that plaintiffs thus disclaimed the existence of specific representations as to whether the loans had been repaid, and cannot now assert that they entered the contract in reliance on those representations. *See Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320–21, 157 N.E.2d 597, 599, 184 N.Y.S.2d 599, 602 (1959). We are not persuaded. The rule of law cited by defendants prohibits a party from claiming that he or she entered a contract in reliance on the other party's oral representations where the contract specifically disclaims the existence of such representations. This doctrine does not apply here for two reasons. First, plaintiffs do not claim that they relied on defendants' oral representations; rather, they claim that they relied on written representations in the contract itself. Second, paragraph 7(C) is not a disclaimer at all. It merely states that plaintiffs had adequate access to the books and records, not that

defendants did not make any representations.

■ Defendants also argue that plaintiffs cannot retain the benefits of the settlement and now sue on the ground that the settlement was induced by fraud. This argument has no merit. A party who has been fraudulently induced to settle a claim may either (1) rescind the settlement or (2) ratify the settlement, retain the proceeds, and institute an action to recover fraud damages. *Slotkin v. Citizens Casualty Co.*, 614 F.2d 301, 312 (2d Cir.1979), *cert. denied*, 449 U.S. 981, 101 S.Ct. 395, 66 L.Ed.2d 243 (1980). Plaintiffs have chosen the latter course.

*Did the Complaint Adequately Plead Scienter?*

■ The complaint pled scienter with sufficient detail to satisfy Fed.R.Civ.P. 9(b). "Although Rule 9(b) provides that intent and 'other condition[s] of mind' may be averred generally, plaintiffs must nonetheless provide some factual basis for conclusory allegations of intent." *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). "These factual allegations must give rise to a 'strong inference' that the defendants possessed the requisite fraudulent intent." *Id.* "[One] method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Id.* Plaintiffs have met that burden.

First, defendants had a motive for committing the alleged fraud—a desire to avoid repaying the loans and to end the earlier litigation. Second, as fiduciaries of various trusts and owners of a controlling interest in the family business, defendants had a clear opportunity to engage in fraud. Defendants' intent is further evidenced by their actions after they signed the Settlement Agreement, when they allegedly attempted to conceal the underpayment from plaintiffs.

*Statute of Limitations*

■ Civil RICO actions are governed by a four-year statute of limitations, which accrues when the plaintiff "discovered or should have discovered the injury." *Bankers*

*Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Because plaintiffs commenced the instant actions on July 29, 1992, the actions are time barred if plaintiffs knew or should have known of their alleged injuries before July 29, 1988. Plaintiffs have alleged facts indicating that defendants successfully concealed their fraud until the fall of 1989. We cannot decide at this time whether the action is time barred. `

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.[2]

---

2. Plaintiffs have alleged a total of eight separate predicate acts. Because they only need to allege two such acts to state a RICO cause of action, we have not considered whether any of the other alleged acts constitutes a predicate act.